191 F.3d 244 (2nd Cir. 1999)
 WILLIE HORNE, Plaintiff-Appellant,
v.
THOMAS A. COUGHLIN, III, Commissioner, New York State Department of Correctional Services; PHILIP COOMBE, former Superintendent, Eastern Correctional Facility; DONALD SELSKY, Coordinator, Inmate Discipline; ARTHUR KRACKE, Lieutenant, Eastern Correctional Facility; and JOSEPH A. DEMSKIE, Captain, Sullivan Correctional Facility, in their individual and official capacities, Defendants-Appellees.
 Docket No. 97-2047
No. 301 - August Term, 1997
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: November 17, 1997
Decided: May 21, 1999
Amended: August 25, 1999
 
 Plaintiff, a New York State prisoner, sued prison authorities under 42 U.S.C. § 1983, alleging that his constitutional rights were violated by the employment of a procedure prescribed by New York regulation for the provision of an employee assistant in prison disciplinary proceedings. The district court dismissed the complaint. The Court of Appeals affirmed the decision by reason of the defendants' qualified immunity.
 On application for rehearing and rehearing in banc, the question was raised whether the Court under County of Sacramento v. Lewis, 118 S. Ct. 1708 (1998), should have passed on the constitutional question either instead of, or in addition to, the ruling based on qualified immunity. The Court of Appeals (Leval, J.) interprets Sacramento not to require lower courts to express views on the constitutional question in all cases, and rules that it is preferable in this case not to express such views.
 DEBORAH SCHNEER, Poughkeepsie, N.Y. (Kenneth R. Stephens, Prisoners' Legal Services of New York, Poughkeepsie, N.Y., Of Counsel) for Plaintiff-Appellant.
 KATHARINE DEMGEN, New York, N.Y. (Dennis C. Vacco, Attorney General of the State of New York, John W. McConnell, Deputy Solicitor General, Robert A. Forte and Belina Anderson, Assistant Attorneys General, New York, N.Y., Of Counsel) for Defendants-Appellees.
 Before: CARDAMONE, WALKER, and LEVAL, Circuit Judges.
 Judge Cardamone dissents by separate opinion.
 LEVAL, Circuit Judge:
 
 
 1
 On consideration of the application for rehearing and rehearing in banc, the question was raised whether, under County of Sacramento v. Lewis, 118 S. Ct. 1708 (1998), we should have first declared whether plaintiff stated a claim for violation of a constitutional right, and only if he did so, decided whether defendants were entitled to qualified immunity because the right was not clearly established at the time of the alleged violation. A footnote in Sacramento describes this sequence of decisions as "[n]ormally" the "better approach." Id. at 1714 n.5.
 
 
 2
 In explaining this approach, the Court pointed out that unless the constitutional issue could arise in a circumstance where qualified immunity is not a defense-in a suit to enjoin future conduct, in an action against a municipality, or in the litigation of a suppression motion in a criminal case-the constitutional issue might repeatedly evade decision. As a result, if courts always avoided the constitutional issue by repeatedly dismissing suits on the basis of the defendants' immunity, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." Id.
 
 
 3
 We recognize the wisdom of the Supreme Court's exhortation. Without doubt, in certain fact patterns allegations of unconstitutional conduct by state officers might repeatedly and indefinitely escape review. If the challenged conduct occurs spontaneously and inflicts harm on the victim without warning, potential victims would have no opportunity to sue for injunctive relief. A retrospective action for damages cannot be brought against a state under §1983, because a state is not subject to suit under the act. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989). And, if the conduct is by municipal officers but is not a part of a municipal policy or practice, then under Monell v. Department of Social Servs., 436 U.S. 658, 690-61 (1978), an action for damages also cannot be brought against the municipality. As a result, in some cases, the only available defendants would be individual officers who could assert their qualified immunity in repeated suits so long as courts had not put them on notice of the illegality of their conduct. If the questioned conduct was not a part of the collection of evidence for a criminal case, the victims would also have no opportunity to cause judicial review through a motion to suppress. Official conduct in such cases might thus indefinitely escape judicial appraisal if the courts addressed only the issue of immunity. Neither state officials nor the public would receive judicial guidance on the lawfulness of injurious official practices.
 
 
 4
 Similarly, even where plaintiffs can have their constitutional claims adjudicated, plaintiffs may effectively be limited to state courts because of the Rooker-Feldman or Younger doctrines or other rules of federalism. See Wilkinson v. Russell, 182 F.3d 89, 106 (2d Cir. June 17, 1999). The consequence would be that such complaints would indefinitely escape federal court review (except in the tiny number of cases heard by the Supreme Court on review of a state's highest court). The Supreme Court has expressed the view, however, that "the very purpose of § 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights." Patsy v. Board of Regents, 457 U.S. 496, 503 (1982) (internal quotations and citations omitted).
 
 
 5
 Those considerations undoubtedly argue in favor of a federal court's reaching the constitutional question in a suit brought under § 1983, notwithstanding the obligation to dismiss by reason of qualified immunity. On the other hand, the circumstances that favor reaching the constitutional issue are not always present. And there are powerful arguments against reaching out in dictum to establish new constitutional rights in circumstances where that reasoning plays no role whatsoever in the disposition of the action.
 
 
 6
 First, the Supreme Court has for generations warned against reaching out to adjudicate constitutional matters unnecessarily. See, e.g., Ashwander v. TVA, 297 U.S. 288, 346 47 (1936) (Brandeis, J., concurring); Burton v. United States, 196 U.S. 283, 295 (1905); Liverpool, N.Y. & Phila. Steamship Co. v. Commissioners of Emigration, 113 U.S. 33, 39 (1885). It is a "fundamental and longstanding principle of judicial restraint [that] courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988). Under our system of constitutional government, we generally prefer some prolongation of uncertainty over unnecessary, hasty resolution of constitutional questions.
 
 
 7
 Furthermore, where there is qualified immunity, a court's assertion that a constitutional right exists would be pure dictum. See Wilkinson v. Russell, 182 F.3d at 112 (Calabresi, J., concurring). It would play no role in supporting the action taken by the court - the dismissal of the case by reason of qualified immunity. Such dictum would, of course, not be binding in future cases. See Seminole Tribe v. Florida, 517 U.S. 44, 67 (1996) ("When an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to that result by which we are bound."); Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.").
 
 
 8
 As is often the case with dictum, our declaration of a new constitutional right would run a high risk of error. Judges risk being insufficiently thoughtful and cautious in uttering pronouncements that play no role in their adjudication. Furthermore, parties may do an inadequate job briefing and presenting an issue that predictably will have no effect on the outcome of the case. A governmental official who knows the suit against him must be dismissed by reason of qualified immunity because the asserted right was not clearly established may have little incentive to contest vigorously the constitutional issue. This is all the more likely where the challenged conduct occurs in a nonrecurring fact pattern, so that the claimed right is not likely to be asserted again against the same defendant. A court may therefore be swayed by the plaintiff's forceful assertion of a constitutional right where a more vigorous and thoroughly researched defense might have showed that the claim is unwarranted. Adjudication in such a case is unreliable because the presentation lacks the "concrete adverseness . . . upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204 (1962).
 
 
 9
 The odd status of declarations of constitutional rights in dictum will likely cause further serious problems. District courts and courts of appeals will declare new constitutional rights as a part of a judgment in favor of the government defendants. The government defendants, as the prevailing parties, will have no opportunity to appeal for review of the newly declared constitutional right in the higher courts. If those government actors defer to the courts' declarations and modify their procedures accordingly, new constitutional rights will have effectively been established by the dicta of lower court without the defendants having the right to appellate review.[1] Only by defying the views of the lower court, adhering to practices that have been declared illegal, and thus inviting new suits will the state officials be able to ensure appellate review of lower court declarations of the unconstitutionality of official conduct. Thus, officials may often be placed in the untenable position of complying with the lower court's advisory dictum without opportunity to seek appellate review, or appearing to defy the lower court's assertion and thus exposing themselves to a risk of punitive damages.
 
 
 10
 Needless to say, if the Supreme Court's discussion in Sacramento is a holding that requires deciding on the claimed constitutional right in all cases, we are bound to follow it even if we think it unwise. However, the Supreme Court carefully avoided saying that the procedure should always be followed. To the contrary, it said that harm would result from "always" doing the contrary. The Court's assertion that consideration of the constitutional question is "[n]ormally" the "better approach" implies that such consideration is not always the "better approach."[2] The Court's cautious language no doubt reflects its awareness of the difficulties outlined above, and the fact that prolonged uncertainty, which was the Court's primary motivating concern, is not always a threat. In many instances, the conditions that can lead to prolonged uncertainty through repeated reliance on qualified immunity are not present.
 
 
 11
 Furthermore, it seems to us of great significance that the Court placed the tentatively worded suggestion in a footnote-scarcely the placement one would expect had the Court intended to command the lower courts to abandon a widespread practice and a generally recognized precept of avoiding unnecessary constitutional adjudication.[3] In joining the Court's opinion, Justice Breyer stated that the Court's precedents "should not be read to deny lower courts the flexibility, in appropriate cases, to decide § 1983 claims on the basis of qualified immunity, and thereby avoid wrestling with constitutional issues that are either difficult or poorly presented." Id. at 1723 (Breyer, J., concurring). The Eleventh Circuit in Santamorena v. Georgia Military College, 147 F.3d 1337, 1343-44 (11th Cir. 1998), interpreted the Supreme Court's words to mean that courts may, in appropriate cases, go directly to the qualified immunity issue. See also Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999) (describing "preference" of Sacramento as "nonmandatory"); Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998) (describing "preference"). We share this understanding.
 
 
 12
 We recognize that since Sacramento, the Supreme Court has twice stated that, where the defendant raises qualified immunity as a defense, a court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." Wilson v. Layne, 119 S. Ct. 1692, 1697 (1999) (quoting Conn v. Gabbert, 119 S.Ct. 1292, 1295 (1999)) (emphasis added). However, Wilson and Conn both relied on Sacramento, and neither purported to abandon the measured position adopted in that decision. The opinions in Wilson and Conn were both also joined by Justice Breyer, who expressly stated in Sacramento that courts need not invariably decide the merits before reaching qualified immunity. And, as described below, both cases also provided sound reasons for reaching the merits. We do not understand Wilson and Conn, to have, intentionally but without explanation, abandoned the carefully modulated position taken in Sacramento and adopted instead a rigid rule requiring federal courts to express advisory constitutional opinions in every case governed by qualified immunity.
 
 
 13
 Our understanding of the Supreme Court's guidance is that lower courts must be mindful of factors and circumstances that often justify addressing the merits of constitutional claims, even though qualified immunity would supply a sufficient ground for decision. On our understanding, the principal concern that justifies addressing the constitutional question, in a suit which in any event must be dismissed, is the likelihood that the question will escape federal court review over a lengthy period.
 
 
 14
 Another factor that may favor reaching the merits is the egregiousness of the conduct that is challenged. When a constitutional violation is especially outrageous, but the right is not yet clearly established, the public interest in clarifying the law is much greater than in cases where important interests weigh on both sides of the balance. See Wilkinson, 182 F.3d 89, 112(Calabresi, J., concurring) (noting that declaration of right in dictum "place[s] government officials on notice that they ignore such 'probable' rights at their peril"). A related factor is the ease of the decision. For a judiciary that is already heavily burdened with cases it must decide,[4] offering an unnecessary but simple solution to an easy problem is better justified than undertaking unnecessarily to untangle a difficult, complex issue. Careful and thorough briefing, more often available to the Supreme Court than the lower courts, can similarly reduce the peril of rendering an advisory ruling asserting (or denying) an important constitutional right. And, other things being equal, where defendants are entitled to qualified immunity, it is more consistent with traditional principles of restraint to reach the merits when the constitutional right in question does not exist than when it does; in the former circumstance, the finding of no right is the holding, and the court is not declaring new constitutional rights in dictum that cannot be appealed.[5]
 
 
 15
 Various factors in Conn and Layne strongly favor the Supreme Court's decision to reach the merits in those cases. In Conn, the Court unanimously rejected the assertion that a lawyer's "right to practice his profession" encompassed a right not to be searched while his client was testifying before a grand jury. Conn, 119 S. Ct. at 1295. Because the Court rejected the putative right, its constitutional decision was not dictum. As there was "no support in [the] cases" for the asserted right, id., the decision was not difficult. In Wilson, the Court found that police officers' gratuitous invitation of reporters and photographers to participate in the search of a private home violated the Fourth Amendment, even though the right was not clearly established. See 119 S. Ct. at 1699-1700. The victims of such a search have no prior notice and thus have no reason to seek an injunction against the invasion in advance. Furthermore, the decision on the merits was straightforward and unanimous.
 
 
 16
 In this case, the key motivating factor cited in Sacramento is absent. The constitutional question raised here is the validity of a prison regulation affecting the conduct of disciplinary proceedings. There is no reason to believe that the questioned regulation will repeatedly, or over a substantial time, escape judicial review in federal court by reason of qualified immunity. Whenever the regulation is applied, adequate opportunity will arise to challenge it in federal court. Because qualified immunity is not a defense in injunctive actions, a prisoner can seek injunctive relief while the disciplinary hearing is pending, or indeed at any time while serving the punishment arising out of the hearing. Such a suit would require adjudication of the constitutional question that we do not answer here. Accordingly, the danger of sustained uncertainty that concerned the Court in Sacramento is not present in this case.[6]
 
 
 17
 Furthermore, whatever result courts may reach when they adjudicate the constitutionality of the regulation at issue, we are confident the regulation does not represent the sort of egregious or outrageous offense that should compel us to warn the State of New York of its unconstitutionality in unappealable dictum.
 
 
 18
 Because the constitutional question in this case is easily amenable to adjudication in a suit for injunctive relief by any adversely affected prisoner, and because this does not represent an instance of egregious, outrageous conduct, we reaffirm our decision to rely on the lack of clearly established law to dismiss Horne's action on grounds of qualified immunity.[7]
 
 
 
 NOTES:
 
 
 [1]
 In Sacramento, for example, the Ninth Circuit found that police officers violate the Constitution when they cause death by recklessly chasing a fleeing motorcycle at high speed. See Sacramento, 118 S. Ct. at 1712-13. The Supreme Court disagreed and overturned this ruling. See id. at 1720-21. Because the Ninth Circuit believed this constitutional right was already clearly established, it had denied qualified immunity. See id. at 1712. It is noteworthy that had the Ninth Circuit, after determining the existence of the constitutional right, found the right was not yet clearly established, the court would have affirmed the district court's dismissal based on qualified immunity. Having won the lawsuit, the police would have been unable to seek review by the Supreme Court of the dictum establishing the new constitutional right. The Supreme Court would have had no opportunity to overturn the circuit court's declaration of a constitutional right.
 
 
 [2]
 While Judge Cardamone dissents from our decision to refrain from offering our view of the constitutional issue and to rely on qualified immunity in this case, he nonetheless asserts that Sacramento "leaves lower courts free [to rely on qualified immunity without more] where they can articulate a persuasive reason for doing so." See Dissent at 4 n.1.
 
 
 [3]
 See John M.M. Greabe, Mirabile Dictum!: The Case for "Unnecessary" Constitutional Rulings in Civil Rights Damages Actions, 74 Notre Dame L. Rev. 403, 410 n.35 (1999) (noting that in a 1997 survey of decisions awarding immunity where no precedent prohibited the conduct at issue, 65% of the decisions did not purport to decide the constitutional merits).
 
 
 [4]
 See Chief Justice William H. Rehnquist, The 1997 Year-End Report on the Federal Judiciary, The Third Branch, Jan. 1998, at 2 (stating that the "upward spiral" of a "large and expanding workload" threatens to "outstrip [the] resources" of the federal judiciary).
 
 
 [5]
 We earlier speculated that the Court might have intended its Sacramento exhortation to apply only to cases in which the lower court could conclude that the constitutional rule asserted by the plaintiff does not exist. The Supreme Court had previously asserted the usefulness of the Sacramento procedure only in cases where the Court found that the asserted right did not exist. See Conn, 119 S.Ct. at 1295; Sacramento, 118 S. Ct. at 1714 n.5; Siegert v. Gilley, 500 U.S. 226, 233-34 (1991). More recently, however, in Wilson, 119 S. Ct. at 1696-97, the Supreme Court followed the Sacramento procedure to declare a new constitutional right while dismissing based on qualified immunity. Accordingly, we abandon our speculation that the Supreme Court might have intended this procedure to apply only to holdings denying the existence of the right.
 Nonetheless, it still seems appropriate for courts to consider whether their evaluation of the constitutional claim will be a holding supporting a judgment of dismissal or an unappealable dictum irrelevant to the judgment of dismissal.
 
 
 [6]
 We cannot agree with Judge Cardamone's assertion that "the prospect of future suits for injunctive relief is no less remote in this context than it was in Sacramento." Dissent at 10. Sacramento concerned the constitutionality of a high speed auto chase. Those harmed in such a chase are not forewarned and have no opportunity to sue to enjoin the clause. As to the prison regulation at issue here, every adversely affected person can sue for an injunction either to bar its application, or to prohibit punishment meted out in proceedings that relied on it. There is no reasonable likelihood the constitutionality of the regulation will escape adjudication through repeated invocation of qualified immunity.
 
 
 [7]
 Judge Cardamone finally complains that we are "unfair[ly]" "turn[ing] a deaf ear" on Horne's plight. Dissent at 11. This emotional plea overlooks the fact that, one way or the other, Horne will emerge the loser of his lawsuit. Our following the Sacramento suggestion could yield one of two results. We might rule that the procedure Horne challenges does not violate his constitutional rights. That would be of no benefit to him. Or we might state, in non-binding dictum, that we believe the procedure does infringe the constitution, but then go on to rule that, by reason of the defendants' qualified immunity, Horne's case must nonetheless be dismissed. Once again, no benefit to Horne.
 The Supreme Court never suggested in Sacramento that immediate broaching of the constitutional question was a matter of fairness to the plaintiff, and we fail to see how this consideration plays any role, since the defendant's entitlement to qualified immunity guarantees plaintiff's defeat.
 
 
 
 19
 CARDAMONE, Circuit Judge, Dissenting from the majority opinion:
 
 
 20
 We have before us a petition for rehearing in a suit by a mentally retarded prisoner, Willie Horne, alleging he was denied the constitutionally required assistance in defending a prison disciplinary proceeding at which he was sentenced to a term of one year of solitary confinement, which at a later rehearing was commuted to a term of six months. Because I find my colleagues' reasons inadequate to justify a departure from the general rule articulated by the Supreme Court in County of Sacramento v. Lewis, 523 U.S. 833, 841-42 n.5 (1998) (Sacramento), I would determine the existence of the constitutional right alleged by Horne before asking whether the right was clearly established at the time of defendants' challenged conduct. I therefore respectfully dissent.
 
 A. The Decision in Sacramento
 
 21
 As a preliminary matter, it may be helpful to examine the Sacramento decision in some detail. There, the Supreme Court faced the question "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." 523 U.S. at 836. The district court had granted summary judgment to the defendant police officer solely on the basis of qualified immunity, reasoning that even assuming a substantive due process violation had taken place, the law on this point was not clearly established at the time of the events in question. See id. at 837-38.
 
 
 22
 In footnote five of the majority opinion, authored by Justice Souter, the Supreme Court rejected the district court's approach, explaining:
 
 
 23
 We do not analyze this case in a similar fashion because, as we have held, the better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all. Normally, it is only then that a court should ask whether the right allegedly implicated was clearly established at the time of the events in question.
 
 
 24
 Id. at 841 n.5 (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)).
 
 
 25
 The Court also rejected the suggestion of Justice Stevens, concurring in the judgment, "that the rule of Siegert should not apply where, as here, the constitutional question presented 'is both difficult and unresolved.'" Id. (quoting id. at 859). The Court gave two reasons for rejecting this suggestion. First, it reasoned that the usual rule of avoiding unnecessary adjudication of constitutional issues was inapposite, since even a finding of qualified immunity with respect to an alleged constitutional violation "requires some determination about the state of constitutional law at the time the officer acted." Id.
 
 
 26
 Second, the Court emphasized that were courts to adhere to the policy of avoidance by deciding cases on qualified immunity grounds, "standards of official conduct would tend to remain uncertain, to the detriment both of officials and individuals." Id. The Court explained that "escape from uncertainty would require the issue to arise in a suit to enjoin future conduct," because the defense of qualified immunity does not apply to suits for injunctive relief; but the Court declined to rely on this possibility, reasoning that this "avenue[] would not necessarily be open, and therefore the better approach is to determine the right before determining whether it was previously established with clarity." Id. at 841-42 n.5. Accordingly, Sacramento went on to assess whether the constitutional right asserted by the plaintiff actually existed, although it ultimately answered that inquiry in the negative. Id. at 854-55.
 
 
 27
 In sum, I understand footnote five in Sacramento to hold as follows: A federal court faced with a suit alleging the deprivation of a constitutional right under 42 U.S.C. §1983 should ordinarily decide whether the constitutional right alleged by the plaintiff actually exists, even where the defense of qualified immunity might provide an alternative ground for decision. Although this principle need not govern in each and every case, it is undoubtedly the "[n]ormal[]" rule and the "better approach" to constitutional adjudication in §1983 litigation. Moreover, neither the policy of avoidance of constitutional questions nor the remote possibility of clarifying the law in later suits for injunctive relief justifies a departure from this general principle. Rather, courts remain free to depart from the general rule only in those situations where they can articulate a persuasive reason for doing so.
 
 B. The Majority's Reading of Sacramento
 
 28
 My colleagues attempt to sidestep this directive, finding "great significance" in the fact that the Sacramento Court articulated its directive in a footnote, as well as in the fact that Justice Breyer's concurring opinion would have allowed district courts "flexibility, in appropriate cases, to decide §1983 claims on the basis of qualified immunity," 523 U.S. at 858. Majority, supra, at 248. But regardless of the fact that the Court placed its command in a footnote, the directive constituted a necessary link in the logic of the opinion, insofar as it provided a rationale for departing from the district court's approach and instead reaching the constitutional question. Even ignoring Justice Breyer's concurring vote, five other Justices voted to join in Justice Souter's opinion for the Court (including footnote five), and such fact alone requires deference to the footnote five discussion as a strong indicator of the Supreme Court's view on this point of law.[1]
 
 
 29
 Indeed, since Sacramento was decided, the Supreme Court has twice reiterated in unqualified terms, and in the main text of its majority opinion, that "[a] court evaluating a claim of qualified immunity 'must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'" Wilson v. Layne, 119 S. Ct. 1692, 1697 (1999) (majority opinion per Rehnquist, C.J., for a unanimous Court in pertinent part) (quoting Conn v. Gabbert, 119 S. Ct. 1292, 1295 (1999) (majority opinion per Rehnquist, C.J., for eight Justices)) (emphasis added). In Wilson, the Court further emphasized that "[d]eciding the constitutional question before addressing the qualified immunity question also promotes clarity in the legal standards for official conduct, to the benefit of both the officers and the general public." 119 S. Ct. at 1697.
 
 
 30
 Likewise, no fewer than seven panels of this Circuit have acknowledged the general rule articulated in footnote five of Sacramento. See Wilkinson v. Russell, No. 98-7663, 182 F.3d 89, at 103 & n.7, 106 (2d Cir. June 17, 1999); Clue v. Johnson, Nos. 97-9522(L), 97-9564(XAP), 179 F.3d 57, 59 (2d Cir. June 10, 1999); Powell v. Schriver, 175 F.3d 107, 110 (2d Cir. 1999); Stuto v. Fleishman, 164 F.3d 820, 825 (2d Cir. 1999); Greenwood v. New York, 163 F.3d 119, 123-24 (2d Cir. 1998); Connell v. Signoracci, 153 F.3d 74, 80 (2d Cir. 1998); Medeiros v. O'Connell, 150 F.3d 164, 169 (2d Cir. 1998). This should come as no surprise, since the general rule already had gained widespread acceptance even before its adoption in Sacramento. See generally Karen M. Blum, Section 1983: Qualified Immunity, in Litigation, at 407, 430-55 (PLI Litig. & Admin. Practice Course Handbook Series No. 595, 1998) (collecting cases).
 
 C. The Majority's Proposed Standard
 
 31
 Nonetheless, my colleagues would ignore the plain language of Conn and Wilson, clinging instead to what they describe as "the carefully modulated position taken in Sacramento." Majority, supra, at 248. In this vein, the majority declares that "the principal concern that justifies addressing the constitutional question, in a suit which in any event must be dismissed, is the likelihood that the question will escape federal court review over a lengthy period." Id. In its own right, the majority's reasoning is internally self-contradictory in its attempt both to downplay the import of the Sacramento rule because of its placement in a footnote, and in the same breath to argue that the qualifications (if any) suggested in that same footnote should take precedence over the mandatory, unqualified language appearing in the main text of two later Supreme Court decisions. While we need not resolve whether Conn and Wilson overrule all implicit exceptions to the Sacramento rule - particularly since there may exist exceptions not implicated by the facts of this case - surely the mandatory language of the Conn and Wilson decisions counsels in favor of a far narrower interpretation of any such exceptions than the majority adopts today. See Wyoming v. Houghton, 119 S. Ct. 1297, 1301 (1999) ("[I]f the rule of law that [our precedent] announced were limited [as respondent asserts], one would have expected that substantial limitation to be expressed.").[2]
 
 
 32
 In support of its broad limitations on the Sacramento rule, the majority also expresses its concern "against reaching out to adjudicate constitutional matters unnecessarily," reasoning that such adjudication would violate the policy of avoidance of constitutional questions by requiring the declaration of new constitutional rights in dictum. See Majority, supra, at 246-47. Yet, as discussed above, the Supreme Court explicitly rejected the policy of avoidance within this context, and instead stressed the need for clarity in the law as the overriding factor. To the extent that the Court's approach requires lower courts to declare new constitutional rights whose existence could otherwise be avoided by deciding cases based on the absence of clearly established law, neither the High Court itself nor previous panels of this Circuit have hesitated to declare "new" rights in this manner. See Wilson, 119 S. Ct. at 1699, 1701 (recognizing Fourth Amendment right against "media ride along" during police execution of arrest warrant in private home); Clue, 179 F.3d 57, at 60-62 (recognizing First Amendment right against governmental employer retaliation for support of minority union faction); Powell, 175 F.3d at 111-14 (recognizing prisoner's privacy interest in medical confidentiality of transsexual status); Greenwood, 163 F.3d at 124 (recognizing psychiatrist's liberty interest arising from government defamation combined with deprivation of property interest in clinical privileges).[3]
 
 
 33
 The majority further complains that the declaration of new rights in dictum will "run a high risk of error" and will preclude appellate clarification of the law, since state actors will be unable to appeal a judgment of dismissal declaring the new right. Majority, supra, at 247-48. But there is no indication that a plaintiff whose suit is so dismissed will lack incentive to appeal, and even if such appeal is limited on its face to the qualified immunity question, the appellate court will be required under Sacramento to review the existence of the constitutional right before reaching that question. To the extent that the lower court's disposition deprives the government as a party of the independent ability to appeal the existence of the new right, the majority's only real alternative is not to declare the right at all, thereby leaving standards of official conduct even more uncertain, to the detriment of both officials and the public. Regardless of whether this panel in its own right would find the latter alternative preferable, the Supreme Court has already clarified that this option is simply unacceptable. See Wilson, 119 S. Ct. at 1697; Sacramento, 523 U.S. at 841-42 n.5.
 
 
 34
 Consequently, I would defer to the Sacramento Court's statement, reiterated by the Conn and Wilson Courts, that the better approach in §1983 litigation is first to decide whether the asserted constitutional right exists and only then to determine whether the right was clearly established. While we need not resolve whether Conn and Wilson foreclose all exceptions to this principle, the Supreme Court's formulation of the principle as a general rule couched in mandatory language requires, at the very least, that a court articulate some persuasive reason to justify its departure from this approach in a given case.
 
 
 35
 Persuasiveness (like beauty) may at times lie in the eye of the beholder, but it does not take the genius of a logician like Bertrand Russell to perceive the weaknesses of the majority's reliance on reasons that Sacramento itself rejected (e.g., the policy of avoidance, the remote possibility of suits for injunctive relief), as well as on even less compelling reasons appearing nowhere in the relevant precedents (e.g., the egregiousness of the challenged conduct, the crowded dockets of the federal judiciary). More importantly, the majority's approach betrays the fundamental "duty of the judicial department, to say what the law is." Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177 (1803) (Marshall, C.J.). If the majority's approach becomes the law of this Circuit, constitutional standards of official conduct will be frozen in uncertainty, a result at odds with government under the rule of law.
 
 D. Application to the Present Appeal
 
 36
 Finally, turning to the case at hand, no persuasive reason has been advanced to depart from the general rule articulated in Sacramento. For their part, my colleagues cite the decision of the Eleventh Circuit in Santamorena v. Georgia Military College, 147 F.3d 1337, 1343-44 (11th Cir. 1998), which departed from the Sacramento rule and dismissed a §1983 action on qualified immunity grounds. See Majority, supra, at 248. But Santamorena explicitly rested its departure on the fact that the case presented "a perplexing question" of substantive due process not easily amenable to adjudication. 147 F.3d at 1343; see id. at 1341 (question presented was "whether a voluntary, instead of an involuntary, custodial arrangement between the State and a citizen could give rise to a special relationship, and thus a constitutional duty"). Here, by contrast, Horne presents a more straightforward question, namely, the form of assistance that procedural due process guarantees a mentally retarded person in defending a prison disciplinary proceeding. Unlike the question of substantive due process in Santamorena, for which "the cited precedents gave much too little guidance," id. at 1342, the procedural question plaintiff asks us to decide implicates a well developed body of case law, see Horne v. Coughlin, 155 F.3d 26, 33-34 (2d Cir. 1998) (Cardamone, J., dissenting).
 
 
 37
 The majority also attempts to justify its departure from the Sacramento rule by noting the possibility that future suits challenging the relevant prison regulations may seek injunctive relief while the disciplinary hearing is pending or during the consequent punishment, thereby eliminating the qualified immunity hurdle and forcing the courts to address the merits of the constitutional question. See Majority, supra, at 249-50. But the prospect of future suits for injunctive relief is no less remote in this context than it was in Sacramento, where the Court expressly declined to rely on such a possibility, 523 U.S. at 841-42 n.5. In the present context, requiring such a suit as a precondition to reaching the precise constitutional question raised by Horne would impose the burden on a mentally retarded prisoner, who already believes he is being denied constitutionally required assistance, to bring a §1983 action within a limited period of time specifically requesting injunctive relief.
 
 
 38
 Moreover, on the facts of this case, Horne was kept in solitary confinement pending rehearing, leaving only 13 days of confinement subsequent to rehearing during which he could have brought the suit for injunctive relief suggested by the majority. Here, the majority's approach threatens to undermine the integrity of the state administrative process by encouraging prisoners to bring federal suit while state disciplinary proceedings are still pending. More fundamentally, to turn a deaf ear at this point because Horne did not bring a suit for injunctive relief is simply unfair to Horne, a person who we do not think imbibed Wright and Miller's Federal Practice and Procedure with his mother's milk, but who nonetheless has just as much interest in the articulation of his constitutional rights as any plaintiff seeking declaratory relief from the federal courts.
 
 
 39
 My colleagues downplay any concern for Horne's stake in this petition as merely an "emotional plea," explaining their view that the state conduct he challenges is not sufficiently egregious to warrant reaching the merits of his petition. Majority, supra, at 249, 250 n.7. Not only is this "egregiousness" factor literally drawn out of thin air, as it appears nowhere in the relevant Supreme Court precedents, but it also defies reason to suggest that the conduct challenged by a suit under 42 U.S.C. §1983 is not sufficiently "egregious" where the challenged denial of assistance may well have resulted in the wrongful solitary confinement of a mentally retarded prisoner for six months. "Case law . . . clarifies that we as members of a civilized nation afford simple-minded people, whether prisoners or not, legal assistance when their liberty is threatened by a process they do not comprehend." Horne, 155 F.3d at 34 (Cardamone, J., dissenting) (citing, inter alia, Vitek v. Jones, 445 U.S. 490, 496-97 (1980)). Therefore, to recognize Horne's stake in the articulation of his constitutional rights is not to issue a mere "emotional plea" on his behalf but rather is to acknowledge the pressing concerns of fundamental fairness that permeate Horne's appeal.
 
 
 40
 The majority's approach also does a disservice to future plaintiffs and to the public insofar as it undermines the duty of the courts "to explicate and give force to the values embodied in . . . the Constitution," Owen M. Fiss, Against Settlement, 93 Yale L.J. 1073, 1085 (1984), thereby "encourag[ing] repeat[ed] unlawful conduct without accountability" on the part of state actors, John M.M. Greabe, Mirabile Dictum!: The Case for "Unnecessary" Constitutional Rulings in Civil Rights Damages Actions, 74 Notre Dame L. Rev. 403, 407 (1999). Even assuming that injunctive relief might be available after termination of punishment in certain circumstances, this "avenue[] would not necessarily be open, and therefore the better approach is to determine the right before determining whether it was previously established with clarity." Sacramento, 523 U.S. at 841-42 n.5.
 
 E. Conclusion
 
 41
 Accordingly, I would determine the existence of the constitutional right alleged by Horne before asking whether that right was clearly established. Further, for the reasons stated in my original dissent, I would find that defendants are not entitled to qualified immunity and would therefore reach the merits of Horne's §1983 due process claim.
 
 
 
 Notes:
 
 
 [1]
 Although a number of Justices authored separate opinions in Sacramento, a majority joined in Justice Souter's opinion for the Court, and all but Justice Stevens would have reached the constitutional question. See 523 U.S. at 855-56 (Rehnquist, C.J., concurring) (noting that the Court had correctly decided the question on which certiorari was granted); id. at 856-58 (Kennedy & O'Connor, JJ., concurring) (explaining the objective character of substantive due process analysis); id. at 858-59 (Breyer, J., concurring) (noting that district courts retain "flexibility, in appropriate cases, to decide § 1983 claims on the basis of qualified immunity"); id. at 859 (Stevens, J., concurring in the judgment) (concurring on qualified immunity grounds); id. at 860-65 (Scalia & Thomas, JJ., concurring in the judgment) (departing from the subjective aspects of substantive due process analysis but reaching the same result on the merits of the constitutional question). Although Justice Breyer's concurring opinion noted that district courts retain discretion to decide § 1983 cases on qualified immunity grounds in appropriate situations, this is entirely consistent with my reading of footnote five. In my view, Sacramento establishes a general rule requiring resolution of the constitutional question in § 1983 cases, but still leaves lower courts free to depart from that rule in limited situations where they can articulate a persuasive reason for doing so.
 
 
 [2]
 As a careful observer of this Court's decisions will note, the majority's original opinion on the petition for rehearing, now superseded by the present majority opinion, similarly relied on the remote possibility of future clarification of the constitutional question as a ground for generally ignoring the Supreme Court's directive in Sacramento. See Horne v. Coughlin, 178 F.3d 603, 606 (2d Cir. 1999). But this holding was explicitly criticized by a subsequent panel of this Court, in light of the Supreme Court's intervening decision in Wilson:
 The Horne majority specifically suggested that the lower federal courts reach the constitutional merits in qualified immunity cases only where there is a "danger of sustained uncertainty" in the law. [Horne, 178 F.3d at 606.] It is not clear whether Wilson, with its seemingly mandatory language, permits such a limitation. We need not resolve this issue here, however. Even under the majority view in Horne, we consider this an appropriate case in which to decide the constitutional issue before us.
 Wilkinson, 182 F.3d89 at 103 n.7. While Wilkinson plainly left open the question of Wilson's import, its criticism should give the majority an additional reason for hesitation in continuing to adhere to its earlier position.
 
 
 [3]
 The majority's original opinion on petition for rehearing, now superseded by the present opinion, strongly suggested that the Sacramento rule was limited to those situations "where it is clear the new constitutional right claimed by the plaintiff does not exist." Horne, 178 F.3d at 605. The majority wisely abandons that position in its present opinion, in light of the Supreme Court's holding in Wilson. See Majority, supra, at 249 n.5. Nonetheless, the majority now asserts, without citation, that "it is more consistent with traditional principles of restraint to reach the merits when the constitutional right in question does not exist than when it does; in the former instance, the finding of no right is the holding, and the court is not declaring new constitutional rights in dictum." Id. at 9. But, I would repeat, "the danger of judicial error that motivates the policy of avoidance persists in equal magnitude where the right is found not to exist, unless perhaps one assumes that judges are less likely to err in denying (as opposed to recognizing) the existence of new constitutional rights." Horne, 178 F.3d at 610 (Cardamone, J., dissenting).