No. 03–863. BUNTING ET AL. v. MELLEN ET AL. C. A. 4th Cir. Certiorari denied.

Opinion of JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE BREYER join, respecting the denial of certiorari.

The "perceived procedural tangle" described by JUSTICE SCALIA's dissent, *post*, at 1022, is a byproduct of an unwise judge-made rule under which courts must decide whether the plaintiff has alleged a constitutional violation before addressing the question whether the defendant state actor is entitled to qualified immunity. JUSTICE BREYER and I both questioned the wisdom of an inflexible rule requiring the premature adjudication of constitutional issues when the Court adopted it. See *County of Sacramento* v. *Lewis*, 523 U. S. 833, 858, 859 (1998). Relaxing that rule could solve the problem that JUSTICE SCALIA addresses in his dissent. JUSTICE SCALIA is quite wrong, however, when he states that the "procedural tangle" created by our constitutional-question-first procedure explains our denial of certiorari in this case. *Post*, at 1022. Indeed, it is only one of three reasons for not granting review. The other two are, first, that we have no jurisdiction, and second, that the alleged conflict of authority is more apparent than real.

Respondents have graduated from the Virginia Military Institute (VMI). The Court of Appeals accordingly held that respondents' "claims for declaratory and injunctive relief are moot" and vacated the District Court's judgment insofar as it awarded such relief. 327 F. 3d 355, 360 (CA4 2003). That leaves respondents'

claim for damages against Bunting in his individual capacity. The Court of Appeals concluded that Bunting is entitled to qualified immunity, *id.*, at 376, and respondents have not challenged that ruling. All that remains, therefore, is the parties' dispute over the constitutionality of VMI's supper prayer.

Whether or not such a dispute would be sufficient to support jurisdiction in different circumstances, it plainly falls short in this case. Bunting has retired from his position as Superintendent of VMI, see *id.*, at 360, and will suffer no direct injury if VMI is unable to continue the prayer. Thus, there no longer is a live controversy between Bunting and respondents regarding the constitutionality of the prayer. As for the other named petitioner, new Superintendent Peay, there *never* was a live controversy. Peay was added to the case (apparently in error) after the Court of Appeals issued its decision vacating the District Court's award of injunctive and declaratory relief. At that point, the only issue was Bunting's individual-capacity liability—an issue in which Peay obviously has no interest. VMI itself is not a party.

The jurisdictional issue in this case differs from that presented in *Erie* v. *Pap's A. M.*, 529 U. S. 277 (2000). The respondent in *Erie*, which operated a nude dancing establishment, obtained an injunction barring the city from enforcing an ordinance banning public nudity. After we granted the city's petition for certiorari to review the state court's decision, respondent submitted an affidavit stating that it had "ceased to operate a nude dancing establishment in Erie." *Id.*, at 287 (internal quotation marks omitted). We concluded, nevertheless, that the case was not moot. We observed that respondent had "an interest in preserving the judgment" of the state court," *id.*, at 288, because it was "still incorporated under Pennsylvania law, and it could again decide to operate a nude dancing establishment in Erie," *id.*, at 287, notwithstanding the owner's "'advanced age'" of 72, *id.*, at 288. Meanwhile, the city had "an ongoing injury because it [was] barred from enforcing the public nudity provisions of its ordinance." *Ibid.* "If the challenged ordinance is found constitutional," we explained, "then Erie can enforce it, and the availability of such relief is sufficient to prevent the case from being moot." *Ibid.* Finally, we emphasized that the case did not involve "run of the mill voluntary cessation" because respondent was seeking to have the case declared moot after *prevailing* in state court. *Ibid.* Respondent's argument, if successful, would have resulted in dis-

missal of the petition, leaving intact the state court's ruling. We noted that "[o]ur interest in preventing litigants from attempting to manipulate the Court's jurisdiction to insulate a favorable decision from review further counsel[ed] against a finding of mootness." *Ibid.*

In this case, by contrast, none of the parties has a present stake in the outcome. There is no reason to believe that Bunting ever will return to VMI in an official capacity, and even if there were, we have made clear that such speculation cannot "shield [a] case from a mootness determination." *City News & Novelty, Inc.* v. *Waukesha,* 531 U. S. 278, 283 (2001) (explaining that the possibility that the respondent in *Erie* would reopen or reinvest in the business was not sufficient to explain our rejection of mootness in that case). Unlike the situation in *Erie,* moreover, there is no injunction presently barring VMI from reinstituting the supper prayer. This case also lacks the potential for gamesmanship that concerned us in *Erie.* Respondents are not seeking to have the case declared moot after prevailing below (respondents lost on the issue of damages), and their graduation from VMI obviously is distinguishable from the voluntary cessation of a business enterprise.

The second reason justifying a denial of certiorari is the absence of a direct conflict among the Circuits. The Courts of Appeals for the Sixth and Seventh Circuits have rejected constitutional challenges to state universities' inclusion of a nondenominational prayer or religious invocation in their graduation ceremonies, reasoning that college-age students are not particularly "susceptible to pressure from their peers towards conformity," *Lee* v. *Weisman,* 505 U. S. 577, 593 (1992). See *Chaudhuri* v. *Tennessee,* 130 F. 3d 232 (CA6 1997); *Tanford* v. *Brand,* 104 F. 3d 982 (CA7 1997). The Fourth Circuit endorsed that principle in theory, but found it unhelpful in this case because of the features of VMI that distinguish it from more traditional institutions of higher education—for example, its use of the "adversative" method and its emphasis on submission and conformity. 327 F. 3d, at 371–372. Given the unique features of VMI, we do not know how the Fourth Circuit would resolve a case involving prayer at a state university, or, indeed, how the Sixth or Seventh Circuits would analyze the supper prayer at issue in this case. Thus, while the importance of this case might have

justified a decision to grant, it is not accurate to suggest that a conflict of authority would have mandated such a decision.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

In this case, the current and former Superintendents of the Virginia Military Institute have asked this Court to review the conclusion, reached by a panel of the Fourth Circuit, that an invocation of God during VMI's Supper Roll Call ceremony is unconstitutional. See 327 F. 3d 355 (2003). The prayer was voluntary, but nonparticipating cadets were required to remain respectfully "at rest" for its duration. *Id.*, at 362. This, the panel concluded, amounted to unconstitutional religious coercion of the sort prohibited by our precedent—principally *Lee* v. *Weisman,* 505 U. S. 577 (1992), a case that involved public high school prayer. The weighty questions raised by petitioners—about the proper application of *Lee* where adults rather than children are the subjects, and about the constitutionality of traditional religious observance in military institutions—deserve this Court's attention, particularly since the decisions of two other Circuits are in apparent contradiction as to whether *Lee* can extend so far. The only explanation for the Court's refusal to resolve a Circuit conflict of such consequence is a perceived procedural tangle of the Court's own making. Far from finding that tangle a justification for rejecting the petition, I find it an additional reason for granting.

This Court has established a mandatory order of priority for resolution of the two standard issues that arise in damages suits brought against government officers under Rev. Stat. § 1979, 42 U. S. C. § 1983, or *Bivens* v. *Six Unknown Fed. Narcotics Agents,* 403 U. S. 388 (1971). A court must ask, first, whether "the facts alleged show the officer's conduct violated a constitutional right"; if so, "the next, sequential step" is to resolve the qualified-immunity claim by asking "whether the right was clearly established." *Saucier* v. *Katz,* 533 U. S. 194, 201 (2001). See *Wilson* v. *Layne,* 526 U. S. 603, 609 (1999); *Conn* v. *Gabbert,* 526 U. S. 286, 290 (1999). "[T]he requisites of a qualified immunity defense *must* be considered in proper sequence." *Saucier, supra,* at 200 (emphasis added).

The *Saucier* constitutional-question-first procedure played a central role in the proceedings below. Two cadets filed suit against Josiah Bunting, then-Superintendent of VMI, challenging

the constitutionality of the prayer, and seeking declaratory and injunctive relief, nominal damages, costs, and attorney's fees. The District Court entered summary judgment for the cadets. That judgment was appealed, and by the time the Fourth Circuit panel ruled, the cadets had graduated. This mooted the declaratory and injunctive relief claims (the only claims the current Superintendent might have inherited when he succeeded Bunting), but the money damages claim against Bunting in his personal capacity remained, and raised the same constitutional question. In accordance with its obligation under *Saucier*, the panel first considered whether the Establishment Clause forbade the prayer, concluding after lengthy analysis that it did. 327 F. 3d, at 365–376. Turning to the second step, the panel quickly determined that the relevant constitutional right was not clearly established because, among other things, several Circuits had previously approved prayer at university functions. See *id.*, at 376 (citing earlier discussion of *Tanford* v. *Brand*, 104 F. 3d 982 (CA7 1997), and *Chaudhuri* v. *Tennessee*, 130 F. 3d 232 (CA6 1997)). The court therefore granted qualified immunity, and judgment, to Bunting.

The Fourth Circuit's determination that a state military college's grace before meals violates the Establishment Clause, creating a conflict with Circuits upholding state-university prayers, would normally make this case a strong candidate for certiorari. But it is questionable whether Bunting's request for review can be entertained, since he *won judgment* in the court below. For although the statute governing our certiorari jurisdiction permits application by "any party" to a case in a federal court of appeals, 28 U. S. C. §1254(1), our practice reflects a "settled refusal" to entertain an appeal by a party on an issue as to which he prevailed. R. Stern, E. Gressman, S. Shapiro, & K. Geller, Supreme Court Practice 79 (8th ed. 2002). We sit, after all, not to correct errors in dicta; "[t]his Court reviews judgments, not statements in opinions." *California* v. *Rooney*, 483 U. S. 307, 311 (1987) *(per curiam)* (internal quotation marks omitted).

I think it plain that this general rule should not apply where a favorable judgment on qualified-immunity grounds would deprive a party of an opportunity to appeal the unfavorable (and often more significant) constitutional determination. That constitutional determination is *not* mere dictum in the ordinary sense, since the whole reason we require it to be set forth (despite the

availability of qualified immunity) is to clarify the law and thus make unavailable repeated claims of qualified immunity in future cases.

In areas other than this, we have in the past entertained two appeals on collateral issues by parties who won below. See *Deposit Guaranty Nat. Bank* v. *Roper*, 445 U. S. 326, 333–336 (1980); *Electrical Fittings Corp.* v. *Thomas & Betts Co.*, 307 U. S. 241 (1939). That these exceptions have been few is simply a consequence of the fact that suitable candidates seldom present themselves. Cf. *Partmar Corp.* v. *Paramount Pictures Theatres Corp.*, 347 U. S. 89, 99, n. 6 (1954). But the *Saucier* procedure gives rise to—*and is designed to give rise to*—constitutional rulings (such as this one) with precedential effect. It seems to me this sort of situation is exactly what we had in mind when we said, in *Deposit Guaranty Nat. Bank*, that "[i]n an appropriate case" a petitioner may appeal an adverse collateral ruling despite having secured a favorable judgment, 445 U. S., at 334. Not only is the denial of review unfair to the litigant (and to the institution that the litigant represents) but it undermines the purpose served by initial consideration of the constitutional question, which is to clarify constitutional rights without undue delay. See, *e. g., Wilson, supra,* at 609; *County of Sacramento* v. *Lewis*, 523 U. S. 833, 841–842, n. 5 (1998).

This problem has attracted the attention of lower courts. Two Circuits have noticed that if the constitutional determination remains locked inside a § 1983 suit in which the defendant received a favorable judgment on qualified immunity grounds, then "government defendants, as the prevailing parties, will have no opportunity to appeal for review of the newly declared constitutional right in the higher courts." *Horne* v. *Coughlin*, 191 F. 3d 244, 247 (CA2 1999) (quoted in *Kalka* v. *Hawk*, 215 F. 3d 90, 96 (CADC 2000)); see *Horne, supra,* at 247, n. 1 (concluding that this Court could not have reviewed the judgment in *County of Sacramento* v. *Lewis, supra,* if the Ninth Circuit had not believed the right clearly established). As both Circuits recognized, the mess up here is replicated below. See *Horne, supra,* at 247 (noting the parallel between unreviewability of district court and court of appeals decisions); *Kalka*, 215 F. 3d, at 96, and n. 9 (similar). This understandable concern has led some courts to conclude (mistakenly) that the constitutional-question-first rule is customary, not mandatory. See *id.,* at 96, 98; *Horne, supra,* at 247, 250; see

also *Pearson* v. *Ramos*, 237 F. 3d 881, 884 (CA7 2001) (doubting that the *Saucier* rule is "absolute," for the reasons given in *Kalka* and *Horne*). The perception of unreviewability undermines adherence to the sequencing rule we have created. Cf. *Koch* v. *Brattleboro*, 287 F. 3d 162, 166 (CA2 2002) (citing *Horne* for the proposition that "[a]lthough we normally apply this two-step test, where we are convinced that the purported constitutional right violated is not 'clearly established,' we retain the discretion to refrain from determining whether, under the first step of the test, a constitutional right was violated at all").

This situation should not be prolonged. We should either make clear that constitutional determinations are *not* insulated from our review (for which purpose this case would be an appropriate vehicle), or else drop any pretense at requiring the ordering in every case.

\*    \*    \*

In sum, we have before us in this petition a constitutional issue of considerable consequence on which the Courts of Appeals are in disagreement. The only apparent obstacle to our review\* is in fact an additional incentive to our review, so that we might eliminate the confusion spawned by our civil-rights constitutional-issue-first jurisprudence. VMI has previously seen another of its traditions abolished by this Court. See *United States* v. *Vir-*

---

\*There is another concern for me, though it is not one that should affect the majority of the Court: Bunting is now retired from VMI. Whether he retains the requisite Article III stake in resolution of the constitutional question after his retirement seems dubious to me, but not to the Court majority, which has upheld standing in a case where the party who had challenged regulation of a nude dancing establishment had retired from that business but could (barely conceivably) return. See *Erie* v. *Pap's A. M.*, 529 U. S. 277, 287–289 (2000). Even if the majority has had a change of heart about this standing point, the case should *still* be taken, to clarify the ordinary availability of appeal, as discussed above, and to specify that, in the unusual situation such as this where lack of standing precludes appeal, resolution of the constitutional question does not have *stare decisis* effect. Cf. 18 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4421, p. 559 (2d ed. 2002) (issue preclusive effect denied to nonappealable findings; "[s]ince appellate review is an integral part of the system, there is strong reason to insist that preclusion should be denied to findings that could not be tested by the appellate procedure ordinarily available"); 18A *id.*, § 4433, at 98 ("If ordinary opportunities to appeal are thwarted by the circumstances of a particular case . . . preclusion may prove unwise").

*ginia,* 518 U. S. 515 (1996). This time, however, its cause has been ignored rather than rejected—though the consequence will be just the same.

JUSTICE STEVENS disagrees that certiorari should be granted for three reasons. *Ante,* p. 1019 (opinion respecting denial of certiorari). The first is that he would prefer to take the course we have repeatedly rejected, viz., to repudiate the *Saucier* procedure. Apart from the unlikelihood that that preference will ever be satisfied, it speaks neither to the feasibility of my proposal nor to the desirability of giving it a thorough airing by this Court. The second reason, that "we have no jurisdiction," *ante,* at 1019, because this case is different from *Erie* v. *Pap's A. M.,* 529 U. S. 277 (2000), seems to me both erroneous and beside the point. A court always has jurisdiction to determine jurisdiction, which is the precise issue I would consider on certiorari. See *United States* v. *Mine Workers,* 330 U. S. 258, 291 (1947). If the Court ultimately concluded that the case is moot (presumably because the prospect that Bunting will return to VMI is significantly more remote than was the prospect that the 72-year-old, retired former owner of Pap's, who swore in an affidavit that he had no plans to reenter the nude dancing business, would nonetheless do so), it would still have established that an appeal is ordinarily available.

The final reason pertains to the merits. *Ante,* at 1021–1022. Although JUSTICE STEVENS concedes the importance of this case, he relies upon the fact that there is no *"direct* conflict among the Circuits," *ante,* at 1021 (emphasis added). That conclusion rests upon factual differences of the sort that ordinarily exist between judgments that evaluate specific practices at specific institutions. It is no surprise that, as JUSTICE STEVENS notes, the Fourth Circuit distinguished cases from other Circuits; that is what courts ordinarily do. But the basis for the distinguishing—that this was a supper prayer at a state military college, whereas the other cases involved graduation prayers at state nonmilitary colleges—is, to put it mildly, a frail one. (In fact, it might be said that the former is *more,* rather than *less,* likely to be constitutional, since group prayer before military mess is more traditional than group prayer at ordinary state colleges.) In any event, the absence of a direct conflict is perhaps a reason why certiorari *need* not be granted, but hardly a reason why it *should* not be. It is surely ironic to invoke, as the basis for denying review of the judgment unfavorable to VMI in this case, the fact

that VMI is in some sense, as we said in *United States* v. *Virginia, supra,* at 519, "an incomparable military college"—inasmuch as that incomparability did not insulate its favorable judgment from our review and reversal in *United States* v. *Virginia* itself. JUSTICE STEVENS's comforting observation that "there is no injunction presently barring VMI from reinstituting the supper prayer," *ante,* at 1021, simply ignores the reality that, if it should choose that course, the present judgment of the Court of Appeals with jurisdiction over the Commonwealth would deny VMI officials a good-faith, qualified-immunity defense against suits for damages.