United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued January 11, 2000 Decided June 23, 2000 

 No. 98-5485

 Ben Kalka, 
 Appellant

 v.

 Kathleen Hawk, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (97cv02259)

 William M. Hohengarten, appointed by the court, argued 
the cause and filed the briefs as amicus curiae on the side of 
appellant.

 Ben Kalka, appearing pro se, was on the briefs for appel-
lant.

 Marina Utgoff Braswell, Assistant U.S. Attorney, argued 
the cause for appellees. With her on the brief were Wilma 
A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant 
U.S. Attorney. Dara A. Corrigan, Assistant U.S. Attorney, 
entered an appearance.

 Before: Williams, Randolph, and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Randolph.

 Opinion concurring in part and concurring in the judgment 
filed by Circuit Judge Tatel.

 Randolph, Circuit Judge: Ben Kalka was a federal prison-
er. After his conviction in 1991, he was incarcerated in seven 
different Federal Correctional Institutions ("FCIs"). Kalka 
claims to be a long-time member of the American Humanism 
Association ("AHA"). He alleges that at six of the prisons, he 
attempted to form "humanist groups within the chapels of the 
prisons they maintain," Complaint at 12, but with one excep-
tion, the wardens refused to recognize humanism as a religion 
and therefore turned him down.1 Acting pro se, Kalka 
brought this action for an injunction and damages against 
officials of the Bureau of Prisons, claiming that they had 
violated and were still violating the religion clauses of the 
First Amendment. We affirm the district court's grant of 
summary judgment in favor of the defendants.

 I

 Each federal prison has a Religious Services Department 
headed by a chaplain responsible for managing the institu-
tion's religious activities. Prison chaplains are also charged 
with deciding whether to introduce new religious components 
to the Department. When a decision on an inmate's request 
cannot be reached locally, the request is passed on for review 
by the Religious Issues Committee at BOP's Central Office in 
Washington, D.C. The Committee then forwards its recom-

__________
 1 Kalka claims that he was allowed to start one AHA chapter at 
FCI-Tucson, in 1994. The Bureau of Prisons submitted evidence to 
the contrary.

mendations to the prison's warden, who makes the final 
determination. See generally Bureau of Prisons Program 
Statement No. 5360.07, Religious Beliefs and Practices (effec-
tive Aug. 22, 1997).

 Although each prison evidently maintains a "chapel," we do 
not know exactly what this entails. A "chapel" might simply 
be a corner of an ordinary room set aside at certain times for 
religious services. (In a letter to the warden at FCI-Jesup, 
Georgia, the prison chaplain wrote of a "multi-purpose audito-
rium (Chapel area).") BOP regulations require only that 
space be made available.

 The most recent events leading to this lawsuit occurred 
when Kalka applied to establish a chapter of the American 
Humanism Association under the aegis of the Religious Ser-
vices Department at FCI-Jesup, Georgia. Kalka supported 
his application with information about humanism, including 
portions of essays, excerpts from AHA publications, and a 
copy of a book entitled The Philosophy of Humanism by 
Corliss Lamont.

 After reviewing these items, Chaplain David W. Fox for-
warded them to the warden, Tom L. Wooten, along with a 
memorandum discussing Kalka's request "to have counselors 
and celebrants enter the prison to conduct a 'non-theistic,' 
secular and naturalistic approach to philosophy." The chap-
lain recommended referring Kalka's application to the Cen-
tral Office Religious Review Committee. He listed several 
matters of concern for the warden's consideration, among 
which were the AHA's non-theistic nature; humanism's lack 
of ceremonial rituals; the description of humanism as a 
philosophy; and Kalka's classification of his faith choice as 
Jewish. Chaplain Fox also mentioned that the AHA "is not 
associated with any type of spirituality or higher being, as is 
espoused by our groups currently meeting under the guide of 
[the] religious services department."

 Heeding the chaplain's suggestion, warden Wooten trans-
ferred Kalka's request to the Central Office Religious Review 
Committee. In his transmittal letter, the warden wrote that 
he had "serious concerns" about recognizing humanism as a 

religion. In particular, he noted that the materials Kalka 
presented clearly document the AHA's "philosophical and 
educational nature" and that "[t]he group does not appear to 
ascribe to any type of Deity, God, or Spiritual Advisor."

 The Religious Issues Committee conducted an extensive 
review of Kalka's submission. In the information he provid-
ed, humanism is described alternately as a philosophy, a non-
theistic religion, a life stance and a world view. A letter from 
a humanist association president notes that even among hu-
manists, the question whether humanism is a religion is a 
"contentious one."

 Corliss Lamont's book, The Philosophy of Humanism, 
considered "a standard text and reference" on secular human-
ism, describes humanism as "a philosophy that advocates 
happiness in this life rather than hope for a heaven in an 
afterlife." Lamont defines humanism as "a philosophy of 
joyous service for the greater good of all humanity in this 
natural world and advocating the methods of reason, science, 
and democracy." Among humanism's central tenets, Lamont 
lists a rejection of the supernatural; the belief that the 
universe is self-subsisting; that humans are a part of the 
natural universe; and that there is no life after death. The 
Lamont excerpt Kalka submitted labels humanism "a many 
faceted philosophy" but makes no reference to any religious 
component.

 Kalka had also submitted a portion of an essay by Gerald 
A. Larue entitled "Positive Humanism." In it Larue writes: 
"it is absolutely essential that we continue to express the 
impact of rational and scientific analysis on modern life and 
thought." Among other things, the author calls upon human-
ists to "take stands against sloppy thinking, against the 
imposition of ancient interpretations on modern life and liv-
ing, [and] against the efforts to impose religious teachings 
and interpretations on society." Rational thought as opposed 
to religious faith is also stressed in another document Kalka 
provided, an AHA statement entitled "What is Humanism?". 
The statement affirms humanism's focus on "reason and 

science" and repeatedly refers to humanism as a philosophy 
rather than a religion.

 Other parts of Kalka's submission describe humanism as a 
religious movement. For instance, an excerpt from the 
AHA's Free Mind magazine discusses the Humanist Society 
of Friends ("HSOF"), a group whose motto is "a scientific 
religion for a scientific age." The article speaks of the 
"concept of Humanism as a non-theistic religion," stating that 
its view of humanism as a religion "allows for the opening of 
many doors and acquiring of many privileges that Humanism 
as a philosophy d[oes] not." Another AHA publication in-
cludes an advertisement advising readers of AHA sponsored 
humanist counselors who provide humanistic marriage and 
memorial services and have the legal status of minister in all 
fifty states.

 Kalka also furnished his own statement attesting that 
humanism "is a study of ethics, and a religion for some in a 
personal way." Whether it was a religion for him, his state-
ment did not say.2

 From these sources, the Committee concluded that the 
needs and purposes of Kalka's proposed AHA group were 
"more philosophical and educational in nature." Additionally, 
one committee member spoke with an outside source associat-
ed with the AHA who confirmed the Committee's determina-
tion that the group was more philosophically oriented. The 
Committee notified FCI-Jesup's warden of its conclusion, 
recommending that he not permit a chapter of the AHA to 
meet under the auspices of the Religious Services Depart-
ment. It reasoned that the requirements of the group could 
be met outside of the Religious Services Department, a 
program which is reserved for groups that are "religious" in 

__________
 2 The AHA, an umbrella organization, includes the Humanist 
Society of Friends, a group which Kalka alleges has received tax-
exempt status based on its religious purpose. See Complaint at 12. 
There is no indication, however, that Kalka is a member of the 
Humanist Society of Friends or that the AHA chapter he intended 
to start would have been associated with that group.

nature. Humanist literature should also be excluded from 
the chapel, the Committee decided, because only literature 
which is "religious" and connected to a recognized religious 
group is "distributed within the confines of the Religious 
Services Department."

 The warden denied Kalka's request to allow AHA meetings 
as a chapel activity but informed him that he could establish a 
humanism group under the aegis of the prison's Education 
Department. On Kalka's administrative appeal, the BOP 
affirmed. Explaining its decision, a BOP administrator wrote 
that AHA's "own newsletters and literature ... consistently 
refer[ ] to Humanism as a 'philosophy' and not a 'religion.' " 
He added that in numerous requests for tax-exempt 
s 501(c)(3) status, the AHA has described itself as "an edu-
cational organization and not a religious organization." See 26 
U.S.C. s 501(c)(3). The BOP official also mentioned the 
Supreme Court decision in Torcaso v. Watkins, 367 U.S. 468 
(1961), commenting that the Court's reference to Secular 
Humanism as a religion applied only to a particular group of 
humanists known as the Fellowship of Humanity. Kalka was 
again told that his group was free to meet as part of the 
prison's Education Department.3

 In September 1997, Kalka brought this action against BOP 
Director Kathleen Hawk and other named and unnamed BOP 
officials, alleging that BOP's policy of excluding humanist 
groups from prison chapels violates the Free Exercise and 
Establishment Clauses of the First Amendment.4 As a reme-
dy, Kalka sought compensatory damages, a portion of which 

__________
 3 Prior to the district court's decision, Kalka declined the offer to 
have AHA meetings in the Education Department. He later 
changed his mind. At the time the briefs were filed, Kalka had 
begun teaching a class on humanism at FCI-Edgefield. See Brief 
Amicus Curiae of Court-Appointed Counsel in Support of Plaintiff-
Appellant Ben Kalka at 12.

 4 Though Kalka's complaint also alleged violations of the Fifth 
and Fourteenth Amendments, those claims were not presented in 
his briefs and were not decided by the district court.

would be used to establish humanist groups in each of the 
nation's prisons.5 He also sought an injunction compelling 
"prison officials so that Chapters of the American Humanism 
Association can be formed in all of the prisons" the BOP 
manages and an order "enjoining prison officials so that they 
will allow their chapels to include for dissemination to inmates 
literature that is not conventionally religious, or that might be 
viewed, in fact, as being anti-religious."6

 The defendants moved to dismiss the claims, and the 
district court, treating the motion as one for summary judg-
ment, ruled in their favor. Kalka v. Hawk, No. 97-2259 
(D.D.C. Sept. 29, 1998). For purposes of resolving the mo-
tion, the court assumed that humanism, as professed and 
practiced by Kalka, was a religion. See mem. op. at 4. It 
concluded that BOP's denying him access to the prison chapel 
did not prevent Kalka from reasonably exercising his human-
ist beliefs. See id. at 6. Kalka failed to establish that BOP's 
offer to allow him to conduct services and distribute literature 
through the Education Department was unreasonable. See 
id. On the Establishment Clause claim, the court held that 
BOP's restrictions on Kalka's use of the chapel were reason-
able, particularly because they did not prevent him from 
freely exercising his humanist beliefs. See id. at 8. Such 
reasonable restrictions are necessary, the court said, to en-
sure the opportunity for all inmates freely to exercise their 
religion. See id. Having concluded that no constitutional 
violations occurred, the district court expressed no opinion on 
the qualified immunity defense of the BOP officials.

__________
 5 Kalka framed his claim for damages as against the BOP not the 
individual defendants. Nonetheless, we will treat it as a Bivens 
claim against the individuals in view of the facts that Kalka filed the 
action pro se, and that earlier in his complaint he cited Bivens v. 
Six Unknown Named Agents of Federal Bureau of Narcotics, 403 
U.S. 388 (1971).

 6 The injunctive claim is now moot in light of Kalka's release from 
federal custody on April 20, 2000. See Amicus 28(j) Letter filed 
May 9, 2000.

 II

 A

 Qualified immunity shields officials from liability for dam-
ages so long as their actions were objectively reasonable, as 
measured in light of the legal rules that were "clearly estab-
lished" at the time of their actions. Harlow v. Fitzgerald, 457 
U.S. 800, 818-19 (1982); Farmer v. Moritsugu, 163 F.3d 610, 
613 (D.C. Cir. 1998). The immunity is not simply from 
damages but from having to participate in the proceedings. 
See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). The Su-
preme Court has therefore instructed the lower courts that 
the validity of a qualified immunity defense should be deter-
mined as early as possible, preferably before discovery and 
trial. See, e.g., Anderson v. Creighton, 483 U.S. 635, 640 n.2 
(1987).

 Both sides tell us we first must determine whether Kalka 
has alleged a constitutional violation, which depends on 
whether the "humanism" to which Kalka allegedly subscribes 
is a "religion" within the meaning of the First Amendment. 
Wilson v. Layne, 526 U.S. 603 (1999), they say, precludes us 
from simply assuming arguendo that Kalka's humanism is a 
"religion," and then determining whether this was clearly 
established.

 The critical passage in Wilson is as follows: "A court 
evaluating a claim of qualified immunity 'must first determine 
whether the plaintiff has alleged the deprivation of an actual 
constitutional right at all, and if so, proceed to determine 
whether that right was clearly established at the time of the 
alleged violation.' " Id. at 609 (quoting Conn v. Gabbert, 526 
U.S. 286, 290 (1999)). The Court had suggested this order of 
decisionmaking in a footnote in County of Sacramento v. 
Lewis, 523 U.S. 833, 841 n.5 (1998), calling it the "better 
approach" because, if courts "always" ruled first on qualified 
immunity when no clearly established constitutional right 
existed, "standards of official conduct would remain uncer-
tain." The Second Circuit treats County of Sacramento, and 
the two cases following it--Conn and Wilson--as not always 
requiring federal courts to dispose of the constitutional claim 

before upholding a qualified immunity defense. See Horne v. 
Coughlin, 191 F.3d 244 (2d Cir. 1999); Sound Aircraft Servs., 
Inc. v. Town of East Hampton, 192 F.3d 329, 334 (2d Cir. 
1999).7 We agree with the Second Circuit's conclusion but 
not with all of its reasoning. It is, for instance, true that 
footnote five in Sacramento was "tentatively worded," Horne, 
191 F.3d at 248, but there appears to be nothing tentative 
about the textual passage in Conn, quoted in Wilson, that the 
courts "must" initially decide if the plaintiff has alleged a 
constitutional right. On the other hand, the Supreme Court 
has itself warned against "dissect[ing] the sentences of the 
United States Reports as though they were the United States 
Code." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 
(1993); Reiter v. Sonotone Corp., 442 U.S. 330, 341 (1979).8 

__________
 7 The Eleventh Circuit had reached the same conclusion, but did 
so before the Court decided Wilson. See Santamorena v. Georgia 
Military College, 147 F.3d 1337, 1343 (11th Cir. 1998). Judge 
Edmondson there expressed doubt whether footnote five in Sacra-
mento represented a holding of the Court; he added that footnote 
five had not expressly invoked the Supreme Court's supervisory 
power over the lower courts. See id. at 1343 n.14. Since then, 
other panels of the Eleventh Circuit have treated the quoted 
language from Wilson as mandatory, as have other circuits. See 
Jones v. Shields, 2000 WL 298244, at *3 (8th Cir. Mar. 23, 2000); 
Kitzman-Kelley v. Warner, 203 F.3d 454, 457 (7th Cir. 2000); 
Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000); 
Hartley v. Parnell, 193 F.3d 1263, 1270-71 (11th Cir. 1999); B.C. v. 
Plumas Unified Sch. Dist., 192 F.3d 1260, 1265-66 (9th Cir. 1999); 
Crosby v. Paulk, 187 F.3d 1339, 1345 (11th Cir. 1999).

 8 Horne mentioned (191 F.3d at 248) that Justice Breyer, concur-
ring in Sacramento, urged preservation of the lower courts' "flexi-
bility, in appropriate cases, to decide s 1983 claims on the basis of 
qualified immunity, and thereby avoid wrestling with constitutional 
issues that are either difficult or poorly presented." 523 U.S. at 858-
59. The fact that Justice Breyer went on to join the majority 
opinions in both Conn and Wilson tends to indicate his belief that 

So perhaps the statement about what the courts "must" do 
describes only what the courts ordinarily should do.

 The Second Circuit also refused to treat the Sacramento 
procedure as mandatory because: "where there is qualified 
immunity, a court's assertion that a constitutional right exists 
would be pure dictum." Horne, 191 F.3d at 247. One 
wonders. A conclusion that a constitutional right exists 
would be dictum if and only if it were unnecessary to the 
decision. But if the Sacramento line of cases requires the 
constitutional issue to be reached first, a lower court's resolu-
tion of that issue becomes a necessary part of its decision. 
The fact that the case theoretically could have been decided 
without deciding the constitutional question is of no moment. 
"A court's stated and, on its view, necessary basis for decid-
ing does not become dictum because a critic would have 
decided on another basis." Henry J. Friendly, In Praise of 
Erie--And of the New Federal Common Law, 39 N.Y.U. L. 
Rev. 383, 386 (1964). As Professor Wright has written, if 
"the Court believes it is deliberately deciding a constitutional 
question, it is wise to suppose that the constitutional question 
has been decided, unless and until some later Court suggests 
a different answer." Charles Alan Wright, The Law of 
Federal Courts s 56, at 385 (5th ed. 1994). Consider Wil-
son. The Court held that police officers violate the Fourth 
Amendment when they bring reporters into the home while 
they are executing a search warrant, but that this constitu-
tional right had not been clearly established and so the 
defendant officers were immune from liability in damages. 
The Supreme Court certainly did not think its conclusion 
regarding the Fourth Amendment was dictum. It framed its 
decision thus: "We hold that it is a violation of the Fourth 
Amendment...." 526 U.S. at 613; see also Pope v. Illinois, 
481 U.S. 497 (1987).

 The Second Circuit gave another reason for its reading of 
Wilson and Conn. Whenever the qualified immunity issue is 
reached--that is, whenever the constitutional issue is first 

__________
the opinions do not mandate a wholesale abandonment of this 
practice.

decided against the official--"the government defendants will 
... have no opportunity to appeal for review of the newly 
declared constitutional right in the higher courts." 191 F.3d 
at 247.9 The severity of this problem may depend on how 
often plaintiffs in Bivens cases fail to appeal adverse immuni-
ty rulings; when they do appeal, the winning officials can 
cross-appeal the ruling against them regarding the constitu-
tionality of their actions. See Robert L. Stern, When to 
Cross-Appeal or Cross-Petition--Certainty or Confusion?, 
87 Harv. L. Rev. 763 (1974). Whatever the percentages, the 
Second Circuit's point is that the Supreme Court surely could 
not have wanted newly-devised constitutional rights to be 
recognized at the district court level without giving federal 
officials any chance for appellate review.

 Several other considerations move us in the direction of the 
Second Circuit. If the Sacramento line of cases laid down a 
hard and fast rule that constitutional issues always have to be 
decided before the immunity defense is considered, we would 
have great difficulty squaring that rule with statements in 
three other Supreme Court decisions. Mitchell v. Forsyth, 
472 U.S. at 528, held that an "appellate court reviewing the 
denial of the defendant's claim of immunity need not consider 
the correctness of the plaintiff's version of the facts, nor even 
determine whether the plaintiff's allegations actually state a 

__________
 9 The courts of appeals have jurisdiction in civil cases over "all 
final decisions of the district courts." 28 U.S.C. s 1291. Normally, 
a party may not appeal from a favorable judgment. See Forney v. 
Apfel, 524 U.S. 266, 270 (1998).

 With respect to Supreme Court review, it is not settled whether a 
prevailing party may petition for certiorari. "The literal language 
of the [28 U.S.C.] s 1254(1) reference to 'any party' is broad enough 
to encompass the successful or prevailing party before the court of 
appeals." Robert L. Stern et al., Supreme Court Practice 45 (7th 
ed. 1993). The Court has granted petitions filed by a winning party 
in the district court after the loser appealed to the court of appeals 
but before the court of appeals rendered judgment. Id. at 44. The 
Court has apparently never granted the certiorari petition of a 
party who prevailed in the appellate court. Id.

claim. All it need determine is a question of law: whether 
the legal norms allegedly violated by the defendant were 
clearly established at the time of the challenged actions...." 
In United States v. Leon, 468 U.S. 897, 924-25 (1984), the 
Court recognized that in "cases addressing the question of 
good-faith immunity under 42 U.S.C. 1983, ... courts have 
considerable discretion in conforming their decisionmaking 
processes to the exigencies of particular cases." And in 
Procunier v. Navarette, 434 U.S. 555 (1978), the Court itself 
went directly to the immunity defense and sustained it with-
out considering whether, as the court of appeals had held, the 
prisoner had a First Amendment right protecting his corre-
spondence against official interference. These decisions flow 
from a long line of Supreme Court pronouncements counsel-
ing judicial restraint in constitutional decisionmaking, the 
most notable of which is Ashwander v. Tennessee Valley 
Authority, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concur-
ring). Federal courts should not decide constitutional ques-
tions unless it is necessary to do so. See Three Affiliated 
Tribes of Fort Berthold Reservation v. World Engineering, 
P.C., 467 U.S. 138, 157-58 (1984). See also, e.g., Jean v. 
Nelson, 472 U.S. 846, 854 (1985); Ashwander, 297 U.S. at 347 
(Brandeis, J., concurring). Before reaching a constitutional 
question, a federal court should therefore consider whether 
there is a nonconstitutional ground for deciding the case, and 
if there is, dispose of the case on that ground. See Gulf Oil 
Co. v. Bernard, 452 U.S. 89, 99 (1981); Mobile v. Bolden, 446 
U.S. 55, 60 (1980); Burton v. United States, 196 U.S. 283, 295 
(1905); Ashwander, 297 U.S. at 347 (Brandeis, J., concur-
ring).

 Furthermore, the Supreme Court's stated rationale for the 
Sacramento procedure does not pertain to all constitutional 
tort actions. The Sacramento footnote states: "if the policy 
of avoidance were always followed in favor of ruling on 
qualified immunity whenever there was no clearly settled 
constitutional rule of primary conduct, standards of official 
conduct would tend to remain uncertain...." 523 U.S. at 841 
n.5. This has little force when injunctive relief against the 
official's actions is potentially available, as it will be when an 

alleged constitutional violation is ongoing. While defendants 
to injunction actions may raise defenses that avoid the consti-
tutional issue, they may not interpose the defense of qualified 
immunity. Although the injunctive portion of this case has 
become moot (see supra note 6), there is still the potential 
that other prisoners who practice humanism may bring such 
suits and settle the question whether humanism (of one form 
or another) is a religion within the First Amendment. This 
possibility of injunctive actions satisfies the Court's desire for 
"clarity in the legal standards for official conduct (Wilson, 526 
U.S. at 609). It is another reason why deciding Kalka's case 
without reaching the constitutional issue does not contradict 
the reasoning of Sacramento or Conn and Wilson, none of 
which involved alleged ongoing violations of a particular 
individual's constitutional rights.

 There is still another distinction between this case and 
Sacramento, Conn and Wilson, perhaps more important than 
the ones already mentioned. Whether Kalka's humanism is a 
religion under the First Amendment could not be decided in 
the abstract. Not only discovery but also a trial may be 
necessary to resolve the question. Yet the qualified immuni-
ty "entitlement is an immunity from suit rather than a mere 
defense to liability; ... it is effectively lost if a case is 
erroneously permitted to go to trial." Mitchell v. Forsyth, 
472 U.S. at 526. In extending qualified immunity to public 
officers, the Court sought to "avoid excessive disruption of 
government and permit the resolution of many insubstantial 
claims on summary judgment." Harlow, 457 U.S. at 818. 
The goal then is to relieve the "defendant who rightly claims 
qualified immunity [from] engag[ing] in expensive and time 
consuming preparation to defend the suit on its merits." 
Siegert v. Gilley, 500 U.S. 226, 232 (1991).

 It thus makes no sense to say that in order to determine 
whether one is entitled to immunity from trial we must first 
hold the trial. Yet that is what we would be saying if we 
proceeded directly to the question whether Kalka's form of 
humanism constituted a religion under the First Amendment. 
For this and the other reasons we have mentioned, we shall 
therefore assume arguendo that Kalka's humanism is a "reli-

gion," but as we next explain, the defendants are still entitled 
to qualified immunity.

 B

 To repeat, qualified immunity shields these defendants 
from liability for civil damages if their actions were objective-
ly reasonable, as measured in light of the legal rules that 
were "clearly established" at the time of their actions. Har-
low v. Fitzgerald, 457 U.S. at 818; Anderson v. Creighton, 
483 U.S. at 639; Farmer v. Moritsugu, 163 F.3d at 613. And 
so we must ask whether the type of humanism to which Kalka 
allegedly subscribes, if a religion, was a clearly established 
"religion" within the First Amendment's meaning.

 We may start by observing that traditional notions of 
religion surely would not include humanism. "[T]he term 
'religion' has reference to one's views of his relations to his 
Creator, and to the obligations they impose of reverence for 
his being and character, and of obedience to his will." Davis 
v. Beason, 133 U.S. 333, 342 (1890); see Note, Toward a 
Constitutional Definition of Religion, 91 Harv. L. Rev. 1056, 
1065 n.60 (1978). But in a draft-exemption case during the 
Vietnam war, the Supreme Court interpreted the statutory 
language "in a relation to a Supreme Being" to include a 
belief "which occupies in the life of its possessor a place 
parallel to that filled by the God" of other traditional reli-
gions, but to exclude "essentially political, sociological, or 
philosophical views." United States v. Seeger, 380 U.S. 163, 
165, 176 (1965). Justice Harlan joined the Seeger opinion 
with the "gravest misgivings," and later concluded that the 
Court's statutory construction had not been legitimate. 
Welsh v. United States, 398 U.S. 333, 345 (1970). Whether 
Seeger meant to define "religion" as used in the First Amend-
ment is doubtful. Instead of discussing the history of the 
First Amendment, the Court there discussed the history of 
the draft. Furthermore, the Court did not even cite the 
constitutional interpretation of religion expressed in Torcaso 
v. Watkins, 367 U.S. 488, 489-90 (1961); and it did not 
explain in what respect an individual's beliefs must be parallel 

to the beliefs of conventional religious faiths (in fervency of 
beliefs? in an overarching world vision? in explaining the 
meaning of life or our place in the universe? in believing in 
powers beyond the ken of science or pure reason?).

 In Torcaso, the Court struck down a Maryland law requir-
ing notaries to declare their belief in God as a condition to 
holding office. States may not, the Court said, "aid all 
religions against non-believers," or "aid those religions based 
on a belief in the existence of God as against those religions 
founded on different beliefs." Id. at 495. To this last 
statement, which signified that "religion" did not necessarily 
entail a belief in God, the Court attached a footnote:

 Among religions in this country which do not teach 
 what would generally be considered a belief in the exis-
 tence of God are Buddhism, Taoism, Ethical Culture, 
 Secular Humanism and others. See Washington Ethical 
 Society v. District of Columbia, 101 U.S.App.D.C. 371, 
 249 F.2d 127; Fellowship of Humanity v. County of 
 Alameda, 153 Cal.App.2d 673, 315 P.2d 394; II Encyclo-
 paedia of the Social Sciences 293; 4 Encyclopaedia Brit-
 tanica (1957 ed.) 325-327; 21 id., at 797; Archer, Faiths 
 Men Live By (2d ed. revised by Purinton), 120-138, 254-
 313; 1961 World Almanac 695, 712; Year Book of Ameri-
 can Churches for 1961, at 29, 47.
 
Id. at 495 n.11. Buddhism and Taoism are well established 
Eastern religions. "The other two examples given by the 
Court refer to explicitly non-Theist organized groups, dis-
cussed in cases cited in the footnote, that were found to be 
religious for tax exemption purposes primarily because of 
their organizational similarity to traditional American church 
groups." Malnak v. Yogi, 592 F.2d 197, 206 (3d Cir. 1978) 
(Adams, J., concurring). "Ethical Culture" referred to the 
beliefs of the Washington Ethical Society, an organization 
that held regular Sunday services with Bible reading, ser-
mons, singing and meditation, and had "leaders" who 
preached and ministered to the group's members. See Wash-
ington Ethical Soc'y v. District of Columbia, 249 F.2d 127, 
128 (D.C. Cir. 1957). The Society was held entitled to a tax 

exemption as a religious corporation even though its members 
were not required to believe in a Supreme Being or a 
supernatural power. See id. at 129. In Fellowship of Hu-
manity v. County of Alameda, 153 Cal.App.2d 673, 674 
(1957), the second case cited in Torcaso, an organization of 
Secular Humanists sought a tax exemption on the ground 
that they used their property "solely and exclusively for 
religious worship." Despite the group's non-theistic beliefs, 
the court determined that the activities of the Fellowship of 
Humanity, which included weekly Sunday meetings, were 
analogous to the activities of theistic churches and thus 
entitled to an exemption. See id. at 697.

 The Court's statement in Torcaso does not stand for the 
proposition that humanism, no matter in what form and no 
matter how practiced, amounts to a religion under the First 
Amendment. The Court offered no test for determining what 
system of beliefs qualified as a "religion" under the First 
Amendment. The most one may read into the Torcaso 
footnote is the idea that a particular non-theistic group calling 
itself the "Fellowship of Humanity" qualified as a religious 
organization under California law. See Grove v. Mead Sch. 
Dist. No. 354, 753 F.2d 1528, 1537 (9th Cir. 1985) (Canby, J., 
concurring) (quoting Malnak, 592 F.2d at 206, 212). See also 
Alvarado v. City of San Jose, 94 F.3d 1223, 1228 & n.2 (9th 
Cir. 1996) (citing cases supporting the limited scope of the 
Torcaso footnote); Peloza v. Capistrano Unified Sch. Dist., 
37 F.3d 517, 521 (9th Cir. 1994) ("[N]either the Supreme 
Court, nor this circuit, has ever held that evolutionism or 
secular humanism are 'religions' for Establishment Clause 
purposes.").

 A reasonable prison official would not have believed that 
excluding Kalka's humanism from the prison's Religious Ser-
vices Program was unlawful. See Kimberlin v. Quinlan, 199 
F.3d 496, 503 (D.C. Cir. 1999). There was neither precedent 
declaring humanism in general to be a religion nor any prior 
ruling on the religious nature of Kalka's beliefs. Information 
considered by the Religious Issues Committee suggested that 
the American Humanism Association's precepts were rooted 
in philosophy not religion. See supra pp. 4-5. Given the 

judiciary's exceedingly vague guidance, in the face of a com-
plex and novel question, the actions of the defendants there-
fore did not violate "clearly established" law.

 Affirmed.

 Tatel, Circuit Judge, concurring in part and concurring 
in the judgment: I believe this court has discretion to avoid 
deciding whether Kalka has " 'alleged the deprivation of an 
actual constitutional right,' " Wilson v. Layne, 526 U.S. 603, 
609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 
(1999)), for only one reason: this case is factually distinguish-
able from Wilson. As my colleagues observe, the constitu-
tional question is one for which injunctive relief is potentially 
available, rendering inapplicable the Supreme Court's ratio-
nale for departing from the principle that constitutional deci-
sionmaking should be avoided where possible. See County of 
Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998). The 
ongoing nature of the alleged violation and consequent poten-
tial for injunctive relief distinguish this case from every one 
in which the Supreme Court has used the Wilson procedure. 
See Wilson, 526 U.S. 603 (media representatives accompanied 
police officers executing arrest warrant in private home); 
Conn, 526 U.S. 286 (prosecutor executed search warrant of 
attorney while client was testifying before grand jury); Sac-
ramento, 523 U.S. 833 (motorcyclist killed during high-speed 
chase by police); and Siegert v. Gilley, 500 U.S. 226 (1991) 
(government employee claimed that supervisor wrote defama-
tory letter). Accordingly, I agree with my colleagues that 
Wilson does not control here.

 I am less persuaded by the three other reasons the court 
gives for not following Wilson. Agreeing with the Second 
Circuit, my colleagues first conclude that "the Supreme Court 
surely could not have wanted newly-devised constitutional 
rights to be recognized at the district court level without 
giving federal officials any chance for appellate review." Slip 
Op. at 11; see also Horne v. Coughlin, 191 F.3d 244, 247 (2d 
Cir. 1999). But why not? District court decisions have no 
precedential effect. They "do not establish the law of the 
circuit ..., nor, indeed, do they even establish 'the law of the 
district.' " In re: Executive Office of the President, No. 
00-5134, ___ F.3d ___, ___ (D.C. Cir. 2000) (quoting Thread-
gill v. Armstrong World Indus., Inc., 928 F.2d 1366, 1371 (3d 
Cir. 1991)). Government officials could hardly be injured by 
an inability to appeal rulings that have no legal force.

 Of course, the fact that in some cases government officials 
might be unable to appeal could be a source of concern if 
unreviewed district court decisions "clearly established" con-
stitutional rights for purposes of qualified immunity analysis. 
In that event, government officials would have to tailor future 
conduct to conform with a district court's interpretation of the 
Constitution, or else risk personal liability should that inter-
pretation later survive appellate review. But most of our 
sister circuits do not look to unreviewed district court deci-
sions for clearly established rights. See, e.g., Sound Aircraft 
Services, Inc. v. Town of East Hampton, 192 F.3d 329, 337 
(2d Cir. 1999); Anaya v. Crossroads Managed Care Sys., 
Inc., 195 F.3d 584, 594 (10th Cir. 1999); Chandler v. James, 
180 F.3d 1254, 1276 (11th Cir. 1999) (Tjoflat, J., concurring); 
Jean v. Collins, 155 F.3d 701, 709 (4th Cir. 1998) (en banc). 
But see Tribble v. Gardner, 860 F.2d 321, 324 (9th Cir. 1988) 
(looking to district court opinions for clearly established 
rights); Hayes v. Long, 72 F.3d 70, 73-74 (8th Cir. 1995) 
(same). Although this circuit has never addressed the issue, 
I think it highly unlikely that we would ever hold that an 
unreviewed district court decision could clearly establish a 
constitutional right. See In re: Executive Office of the 
President, No. 00-5134, ___ F.3d at ___.

 I also think the nonappealability concern is too sweeping to 
coexist with this court's statement that "courts ordinarily 
should" follow the Wilson procedure. Slip Op. at 10. That 
concern applies to all qualified immunity claims before district 
courts, for at the time of decision district judges will have no 
way of knowing whether a plaintiff would appeal an adverse 
immunity ruling. But if it applies to all cases, it cannot be a 
reason for departing from the ordinary way of doing things.

 Nor do I share the court's second concern: that "we would 
have great difficulty squaring [the Wilson procedure] with 
statements in three other Supreme Court decisions." Slip 
Op. at 11. To begin with, the most recent of those three 
cases was decided in 1985, see Mitchell v. Forsyth, 472 U.S. 
511 (1985), yet twice in 1999 the Supreme Court stated that 
courts "must" reach the constitutional issue before deciding 

whether the right allegedly violated was clearly established, 
see Wilson, 526 U.S. at 609; Conn, 526 U.S. at 290, and four 
times in the 1990s the Supreme Court itself followed that 
procedure. See Wilson, 526 U.S. 603; Conn, 526 U.S. 286; 
Sacramento, 523 U.S. 833; and Siegert, 500 U.S. 226. Surely 
it is these more recent cases that reflect the Supreme Court's 
current view.

 In any event, we have no need to square the Wilson 
procedure with the earlier decisions, for the Supreme Court 
has already done so. As my colleagues observe, the earlier 
"decisions flow from a long line of Supreme Court pronounce-
ments counseling judicial restraint in constitutional decision-
making, the most notable of which is Ashwander v. Tennessee 
Valley Authority, 297 U.S. 288, 346-47 (1936) (Brandeis, J., 
concurring)." Slip Op. at 12. In Sacramento, however, the 
Supreme Court expressly held that the Ashwander principle 
did not apply to the constitutional tort claim at issue there:

 [T]he generally sound rule of avoiding determination of 
 constitutional issues does not readily fit the situation 
 here; when liability is claimed on the basis of a constitu-
 tional violation, even a finding of qualified immunity 
 requires some determination about the state of constitu-
 tional law at the time the officer acted. What is more 
 significant is that if the policy of avoidance were always 
 followed in favor of ruling on qualified immunity whenev-
 er there was no clearly settled constitutional rule of 
 primary conduct, standards of official conduct would tend 
 to remain uncertain, to the detriment both of officials and 
 individuals.
 
Sacramento, 523 U.S. at 841 n.5.

 With respect to the court's concern that the Wilson proce-
dure might require discovery and trial to resolve constitution-
al questions, thereby depriving defendants of immunity from 
suit, see Slip Op. at 13, Wilson states that courts "must first 
determine whether the plaintiff has alleged the deprivation of 
an actual constitutional right at all...." 526 U.S. at 609 
(emphasis added). To me, this suggests that courts should 
begin by asking only whether a plaintiff's allegations, if true, 

make out a constitutional violation. Siegert, moreover, makes 
clear that the Court envisioned that the constitutional issues 
would be resolved as "purely legal" ones. 500 U.S. at 232. 
Indeed, the primary reason Siegert gave for deciding the 
constitutional question is precisely the reason this court gives 
for avoiding it:

 A necessary concomitant to the determination of whether 
 the constitutional right asserted by a plaintiff is "clearly 
 established" at the time the defendant acted is the 
 determination of whether the plaintiff has asserted a 
 violation of a constitutional right at all. Decision of this 
 purely legal question permits courts expeditiously to 
 weed out suits which fail the test without requiring a 
 defendant who rightly claims qualified immunity to en-
 gage in expensive and time consuming preparation to 
 defend the suit on its merits. One of the purposes of 
 immunity, absolute or qualified, is to spare a defendant 
 not only unwarranted liability, but unwarranted demands 
 customarily imposed upon those defending a long drawn 
 out lawsuit.
 
Id.

 Finally, and most important, consideration of these last 
three reasons for not following Wilson is precluded by Wilson 
itself. The Supreme Court could not have spoken in more 
mandatory terms: "A court evaluating a claim of qualified 
immunity 'must first determine whether the plaintiff has 
alleged the deprivation of an actual constitutional right at 
all.' " Wilson, 526 U.S. at 609 (emphasis added) (quoting 
Conn, 526 U.S. at 290). As the Supreme Court has also made 
clear, "[i]f a precedent of [the Supreme] Court has direct 
application in a case, yet appears to rest on reasons rejected 
in some other line of decisions, the Court of Appeals should 
follow the case which directly controls...." Rodriguez de 
Quijas v. Shearson/American Express, Inc., 490 U.S. 477, 484 
(1989). Only because Wilson does not directly control on 
these facts do we have discretion to avoid determining wheth-
er Kalka has "alleged the deprivation of an actual constitu-
tional right at all." Wilson, 526 U.S. at 609.