**Paul MOLLICA, Plaintiff–Appellant,**

v.

**James A. VOLKER, Defendant–Appellee.**

**Docket No. 99–9287.**

United States Court of Appeals, Second Circuit.

Argued: April 28, 2000

Decided: Oct. 6, 2000

---

Russell A. Schindler, Kingston, NY, for Appellant.

Alicia R. Ouellette, Assistant Solicitor General, Office of the Attorney General, (Eliot Spitzer, Attorney General of the State of New York, Albany, NY), for Appellee.

Before: JACOBS, LEVAL, and SACK, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiff-appellant Paul Mollica appeals from the district court's grant of summary judgment to the defendant. Mollica brought suit in the United States District Court for the Northern District of New York (Scullin, *J.*) pursuant to 42 U.S.C. § 1983, complaining that defendant James Volker, an officer of the New York State Department of Environmental Conservation, had violated his Fourth Amendment right to be free from unreasonable search and seizure by stopping him at a checkpoint during hunting season to make deer tag and weapon safety checks. The district court granted summary judgment to Volker. The court found no violation of Mollica's Fourth Amendment rights and, in any event, that Volker was entitled to qualified immunity. We affirm on the ground that Volker was entitled to qualified immunity.

## BACKGROUND

On November 23, 1997, during hunting season, on County Road 2 in Greene County, at its intersection with Ski Run Road (also referred to by the parties as Bearpen or Bear Pen Road), environmental conservation officer Volker set up a checkpoint. He had received no specific instruction from superiors at the Department of Environmental Conservation to do so, but testified that his "assignment was to conduct a patrol for deer season checking deer hunters." Ski Run Road is a dirt road providing access to a State-owned hunting ground. Volker's purpose was to stop all vehicles leaving the hunting ground on Ski Run Road to make routine deer tag and weapons safety checks. That evening at approximately 7:00 P.M., sometime after dark, Mollica drove down Ski Run Road after hunting for several days. Mollica saw Volker's official, marked vehicle parked at the intersection. Mollica contends that Volker ordered him to exit his vehicle. Volker contends Mollica stopped and exited his vehicle without having been told to do so. Because, on appeal from a grant of summary judgment, we review the evidence in the light most favorable to the non-moving party, *see Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir.1993), we assume for purposes of our discussion that Volker ordered Mollica to stop and exit his vehicle. Volker in any event does not dispute that he intended to stop Mollica's vehicle.

Upon exiting his vehicle, Mollica approached Volker's vehicle and expressed his refusal to consent to any search. At this time, Volker's partner, a Greene County Deputy Sheriff, shone his flashlight into Mollica's car and looked in it from the outside. Once Volker ascertained Mollica had no deer, he told Mollica he was not being detained. Mollica returned to his vehicle and drove away. He then brought this suit.

## DISCUSSION

Mollica's primary contention is that Volker's stopping him and ordering him out of his vehicle as part of a "checkpoint" and then supervising his partner's shining a light in Mollica's vehicle, without justification based on any particularized suspicion, violated his Fourth Amendment right to be free from unreasonable seizure and search.

 We focus first on the constitutionality of the initial stop because if a stop is lawful, passengers and drivers have no Fourth Amendment interest in not being ordered out of the stopped vehicle. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (holding that passengers in lawfully stopped car have no Fourth Amendment interest in not being ordered out of car); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (holding that once vehicle is lawfully stopped, ordering driver out of car is a *de minimis* intrusion and driver has no Fourth Amendment interest in not being ordered out of car). Moreover, once a vehicle is lawfully stopped, a police officer's looking through the windows into the vehicle from outside, even when shining a flashlight to illuminate the inside of the vehicle, does not constitute a "search" of the vehicle within the meaning of the Fourth Amendment. *See New York v. Class,* 475 U.S. 106, 118, 106 S.Ct. 960, 89 L.Ed.2d 81 (1986) (locations inside an automobile, in plain view of persons outside the automobile, are not "subject to a reasonable expectation of privacy"); *Texas. v.*

*Brown,* 460 U.S. 730, 740, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.") (citations omitted) (plurality of four Justices; other five Justices concurring in judgment and disagreeing on unrelated grounds); *id.* at 739–40, 103 S.Ct. 1535 ("It is ... beyond dispute that [the officer's] action in shining his flashlight to illuminate the interior of [defendant's] car trenched upon no right secured ... by the Fourth Amendment."); *United States v. Ocampo,* 650 F.2d 421, 427 (2d Cir.1981) (holding that, even though a police officer needed to use a flashlight to illuminate the inside of a lawfully stopped car, the item glimpsed was "in 'plain view' ").

The Supreme Court first addressed the Fourth Amendment implications of motor vehicle checkpoints in *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). *Ortiz* held that absent probable cause or consent, border patrol officers could not search vehicles at a traffic checkpoint about 65 miles away from the border, but did not address the question whether the checkpoint itself (and any stoppage, slowdown, or other detention arising out of the checkpoint's operation) was permissible. The next year, in *United States v. Martinez–Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Court reached the question it had previously reserved; it held that although a stop at a fixed checkpoint some distance from the border between Mexico and the United States for brief questioning of the vehicle's occupants, to determine if the vehicle might be carrying illegal aliens, constituted a "seizure" for Fourth Amendment purposes, it was lawful. More recently, the Court applied the analysis of *Martinez–Fuerte* to a temporary checkpoint used to check drivers briefly for signs of intoxication, *see Michigan Dept. of State Police v. Sitz,* 496 U.S. 444, 110 S.Ct. 2481, 110

L.Ed.2d 412 (1990), and again, found the checkpoint constitutional.

■ The *Sitz* Court explained that a motor vehicle checkpoint's reasonableness, and thus its constitutionality, is determined by evaluating and balancing three broad factors—the magnitude of the State's interest in operating the checkpoint, the intrusion inflicted upon motorists by the operation of the checkpoint, and the degree to which the operation of the checkpoint (the seizure) advances the State's interest, also referred to as "effectiveness." *See id.* at 448–455, 110 S.Ct. 2481.

In *Sitz* and *Martinez–Fuerte*, the government's interests were extremely weighty. In *Sitz*, the State's interest was in saving human lives by preventing intoxicated drivers from continuing to drive, *see id.* at 451, 110 S.Ct. 2481; in *Martinez–Fuerte*, the government's interest was in stemming the flow of illegal immigrants, *see* 428 U.S. at 552, 96 S.Ct. 3074. Likewise, in *Maxwell v. City of New York*, 102 F.3d 664 (2d Cir.1996), we upheld the operation of a checkpoint established for cars entering a portion of the Soundview neighborhood of the Bronx following a series of drive-by shootings; in so doing, we essentially relied on the State's interest in preserving human life.

The second prong of the balancing test used to determine the reasonableness of a motor vehicle checkpoint looks at the degree of intrusion and inconvenience inflicted on motorists by the operation of the checkpoint. The Supreme Court concluded that the intrusion inflicted upon motorists in the *Sitz* and *Martinez–Fuerte* checkpoints was minimal. In reaching this conclusion, in each case, the Court noted that the location of and general manner of conducting the checkpoints at issue were not determined by individual law enforcement officers "in the field" exercising their personal discretion, but were established by higher administrative authorities. *See Sitz*, 496 U.S. at 447, 452–53, 110 S.Ct. 2481; *Martinez–Fuerte*, 428 U.S. at 553,

559, 96 S.Ct. 3074. The Court also observed that checkpoints were generally less intrusive than generic roving patrols because " '[r]oving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists.' " *Sitz*, 496 U.S. at 453, 110 S.Ct. 2481 (quoting *Ortiz*, 422 U.S. at 894, 95 S.Ct. 2585; citing *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. 3074).

As to "effectiveness," *Sitz* emphasized the need to defer to governmental officials' decisions regarding resource allocation in evaluating the efficacy of a checkpoint. *See* 496 U.S. at 453–54, 110 S.Ct. 2481. In *Maxwell*, we noted that the effectiveness inquiry involves only the question whether the checkpoint is a "reasonable method of deterring the prohibited conduct;" the test does not require that the checkpoint be "the most effective measure." *Maxwell*, 102 F.3d at 667.

■ Volker contends that the district court's judgment must be affirmed as there can be no doubt he is entitled to qualified immunity. We agree. Qualified immunity "shields [police officers] from personal liability for damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991) (citations omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and citing, inter alia, *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). For a constitutional right to be "clearly established" for purposes of determining whether an officer is entitled to qualified immunity, the

> contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by quali-

fied immunity unless the very action in question has previously been held unlawful, but it is to say that *in the light of pre-existing law the unlawfulness must be apparent.*

*Anderson,* 483 U.S. at 640, 107 S.Ct. 3034 (citations omitted) (emphasis added). We have interpreted this standard to require three elements:

> (1) ... [that] the right in question [be] defined with "reasonable specificity"; (2) [that] the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) [that] under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Shechter v. Comptroller of the City of New York,* 79 F.3d 265, 271 (2d Cir.1996) (quoting *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989)). As we discussed above, the Supreme Court and this Circuit have recognized, "with 'reasonable specificity,'" *id.,* the right of a motorist to be free from being stopped by the operation of an unreasonable checkpoint.

■ The determinative question therefore becomes "whether under preexisting law [Volker] ... would have understood ... his ... acts [to be] unlawful." *Id.* Neither we nor the Supreme Court have ever found the brief detention and inquiry incidental to the operation of a particular motor vehicle checkpoint to be unconstitutional. There is no caselaw clearly establishing that what Volker did was unreasonable or violated the Constitution. We think that any unlawfulness in Volker's checkpoint would not have been apparent to a reasonable officer. We therefore must affirm the district court's grant of summary judgment on the basis of qualified immunity.

■ The more troublesome question is whether, having recognized that the suit must be dismissed by reason of immunity, we should push further to announce a view as to whether Volker's operation of the checkpoint did or did not violate the Constitution. The Supreme Court has urged lower courts to answer the ultimate constitutional question, rather than rely solely on qualified immunity, lest the "standards of official conduct ... tend to remain uncertain." *County of Sacramento v. Lewis,* 523 U.S. 833, 841 n. 5, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) ("[T]he better approach to resolving cases in which the defense of qualified immunity is raised is to determine first whether the plaintiff has alleged a deprivation of a constitutional right."). *See also Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (applying *Sacramento* in context of claim that police violated Fourth Amendment by inviting press to accompany police in executing search warrant in private residence); *Conn v. Gabbert,* 526 U.S. 286, 290, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999) (applying *Sacramento* in context of claim brought by attorney that prosecutors violated attorney's and client's constitutional rights by executing search warrant while client testified in grand jury); *Siegert v. Gilley,* 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (observing that it is preferable when a defense of qualified immunity is raised to address whether the underlying constitutional right exists before addressing whether the right is clearly established). In *Horne v. Coughlin,* 191 F.3d 244 (2d Cir.1999), we considered whether the *Sacramento* dictum should be regarded as having mandated a procedure to be followed in all cases, or as guidance to be followed in suitable cases but not in cases where the disadvantages of the procedure would outweigh the benefits. We observed that, while in some circumstances it would be highly desirable for a court to reach the constitutional question, in others, it could be quite harmful. When declaration of a constitutional right is mere dictum, as it must be if the defendant is entitled to qualified immunity, a court "risk[s] being insufficiently thoughtful and cautious." *Id.* at 247. Furthermore, a "governmental official who knows the suit

against him must be dismissed by reason of qualified immunity because the asserted right was not clearly established may have little incentive to contest vigorously the constitutional issue." *Id.* Perhaps most importantly, if constitutional rights are announced in dictum in cases in which government officials prevail on qualified immunity grounds, governmental actors will not be able to obtain appellate review of the determination in dictum that the practice is unconstitutional. *See id.* at 247–48.

The concerns we discussed in *Horne* counseling against the articulation of constitutional rights in dictum apply forcefully to the case before us. Determining the constitutionality of Volker's checkpoint would require resolution of a complex constitutional question by balancing the factors determining the reasonableness of a checkpoint, where not all factors clearly point in the same direction. Traditional principles of restraint counsel against unnecessary adjudication of this complex constitutional question. *See Horne,* 191 F.3d at 246 (citing Supreme Court cases "warn[ing] against reaching out to adjudicate constitutional matters unnecessarily").

■ We are inclined to believe that, were it required to be decided, Volker's checkpoint should probably be sustained. Some of the factors that have influenced the Supreme Court clearly favor upholding the checkpoint. First, Volker's checkpoint was in one way actually less intrusive than those approved in *Sitz* and *Martinez–Fuerte.* According to the implications of Volker's testimony, it was situated so as to stop few cars, the majority of which were likely to be hunters. Hunters, having chosen to participate in a highly regulated activity, have a lesser expectation of freedom from such intrusions than citizens not engaged in regulated activity. *Cf. Vernonia Sch. Dist. 47J v. Acton,* 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) ("[S]chool athletes have a reduced expectation of privacy.... Somewhat like adults who choose to participate in a 'closely regulated industry,' students who voluntarily participate in school athletics have reason to expect intrusions upon normal rights and privileges.") (citing *Skinner v. Railway Labor Execs. Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (upholding drug and alcohol testing for railroad employees) and *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (upholding warrantless search of gun dealer's business premises)). Secondly, as the district court pointed out:

It would be impossible for environmental conservation officers to perform their regulatory functions without stopping hunters as they leave known public hunting areas. The only other way they could enforce their mandate would be to go into the woods to search for hunters actively engaged in hunting. Such a course of action would not only be absurd but it would also be extremely (and unreasonably) dangerous. Furthermore, it is impossible to determine whether game is properly tagged until after the hunter ha[s] secured the game and ha[s] departed the area.

Volker, furthermore, could not have proceeded by attempting to spot drivers whose particular characteristics gave rise to a reasonable suspicion. Unlike driving under the influence of alcohol, the possession of improperly tagged deer cannot be readily identified by the manner of driving, or other features ascertainable without stopping a motor vehicle. Use of a checkpoint under such circumstances could even serve as a means of preventing individual officers from making stops based on illegitimate criteria. These factors tend to support the defendant as to the "effectiveness" inquiry.

In some respects, however, the constitutionality of Volker's checkpoint is less clear than the constitutionality of the checkpoints in *Martinez–Fuerte, Sitz,* and *Maxwell.* The dominant governmental interest Volker points to is the State's interest in regulating the taking of deer—arguably less weighty than the interests at stake in *Sitz, Martinez–Fuerte,* and *Maxwell.* It is

true, Volker testified he intended also to conduct checks for weapons safety, which would serve the interest of protecting human life. On the other hand, there was no corroboration from any higher state authority that it was state policy to establish checkpoints to check for weapons safety. And, while Mollica did not dispute Volker's assertion, it is somewhat undermined by the fact that Volker did not undertake a safety check of Mollica's weapons. Moreover, whereas in the previously cited cases, superior officials had established policy and directed subordinate officers to establish official checkpoints, to be operated at specific locations and in accordance with specific guidelines, Volker was acting pursuant to his own discretion. He was instructed only to "conduct a patrol for deer season checking deer hunters." The ad hoc, unsupervised nature of Volker's checkpoint is a factor the Supreme Court has identified as tending to undermine a finding of reasonableness. *See Sitz,* 496 U.S. at 447, 452–53, 110 S.Ct. 2481; *Martinez–Fuerte,* 428 U.S. at 553, 559, 96 S.Ct. 3074. Finally, unlike the large, official checkpoints at issue in *Sitz* and *Martinez–Fuerte,* the checkpoint established by Volker at night on a presumably seldom-traveled road may have had the same capacity to frighten motorists that caused the Supreme Court in *Sitz* and *Martinez–Fuerte* to frown on roving patrols.

Because the district court's decision was made on summary judgment, as is common with dismissals based on qualified immunity, the record is quite scanty. The only evidence of the state's interest in establishing Volker's checkpoint is supplied by defendant Volker's own brief deposition testimony. The record includes no assertion by any higher authority as to whether Volker's superiors encouraged the establishment of such checkpoints, whether they believe it is a desirable way to enforce the law, how checkpoint sites should be selected, or how efficacy in enforcing the law should be balanced against inconvenience to or other impositions on motorists. While Volker testified, as noted above, that his objective included not only monitoring to see that deer were taken only in conformity with state law, but also monitoring weapons safety, there was no evidence as to whether weapons safety was within the scope of his duties, or within the Department's policies. Furthermore, the evidentiary record with respect to efficacy and intrusiveness to non-hunter motorists is very thin. Thus, while we are inclined to think that Volker's checkpoint would be found permissible under the Supreme Court's standards, expressing such a conclusion would involve some speculation and would require us to make assumptions to fill the gaps in a scanty record.

We might remand and instruct the district court to require the parties to participate in further proceedings and hearings needed to fill out the record, notwithstanding that their suit has been fully adjudicated by our decision on qualified immunity. But we cannot imagine that the Supreme Court intended that trial courts would direct parties to participate in additional unnecessary evidence-gathering proceedings in which the parties had no practical interest—solely to enable the court to utter advisory dicta on constitutionality.

Furthermore, the case before us differs from *Sacramento* in highly relevant respects. *Sacramento* involved a challenge to the constitutionality of a police officer's causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender. The challenged conduct was not amenable to challenge through proceedings in which a qualified immunity defense would be unavailable, such as a suit seeking injunctive relief, relief against a municipality, or in a suppression motion in a criminal proceeding. *Sacramento* thus presented the type of case in which standards of official conduct might well be effectively immune to challenge if courts repeatedly dismissed claims by reason of qualified immunity without answering the underlying constitutional question. But, as in *Horne,* the case before us presents a very different situation: Mollica or another plaintiff may bring a

suit for injunctive relief against future use of the checkpoint. And any hunter upon whom sanction is imposed arising from the operation of the checkpoint may move to suppress the incriminating evidence obtained through the allegedly unconstitutional checkpoint. In such proceedings, the constitutionality of the checkpoint would need to be addressed.

Given the scant record before us (as is common in appeals from summary judgment based on qualified immunity), we are faced with three possible courses of action: (1) reach out on an inadequate record to announce a view, in dictum, on a constitutional question whose resolution is unnecessary to decide the case, (2) remand to the district court and direct the district court to require the parties to participate in further proceedings that will have no bearing on the result of their case, or (3) decline to express a view on the underlying constitutional question since we lack adequate information to do so. We think it clear that the third option is the preferable one. We do not read the Supreme Court's precedents as to the contrary. Without doubt there are circumstances that strongly favor the course of action suggested in footnote five of *Sacramento*. *See, e.g., Wilkinson v. Russell*, 182 F.3d 89, 106–07 (2d Cir.1999) (addressing underlying constitutional question, notwithstanding a finding of qualified immunity, in federal damage action challenging constitutionality of state child abuse investigation where a federal suit for injunctive relief would likely be barred by *Rooker–Feldman* or *Younger* abstention). But there are others that do not. We conclude that Volker is entitled to qualified immunity and do not reach out to answer whether Volker's checkpoint was constitutional.

## CONCLUSION

The judgment of the district court dismissing the action is AFFIRMED.