Sarah HUSAIN, Devon Blinth, Colleen McGraham, Jeff McGraham, Kathleen McHugh, Marc J. Peseau, Kasadore Ramkisson, Neil Schuldiner, William Wharton, and Manjula Wijerama, Plaintiffs,

v.

Marlene SPRINGER, Carol Jackson, Kathleen Galvez, Marla Brinson, Michael Silva, Winsome Alston, Sibi Geevarghese, Joseph Canale, Juergen Schnetzer, Andre Woods, Charlo Almeda, Christopher Alvarez, Kellyanne Biesty, Mary Anne Christensen, Luis Cruzatte, W. Ann Reynolds, Robert E. Diaz, Roy Moskowitz, Michael Solomon, the City University of New York, the College of Staten Island, the Student Election Review Committee of the College of Staten Island, the Board of Trustees of the City University of New York, and Matthew Goldstein, Defendants.

No. 97 CV 2982 NG.

United States District Court, E.D. New York.

Sept. 2, 2004.

---

Ronald B. McGuire, Jersey City, NJ, for plaintiff.

New York State Attorney General, By Steven L. Banks, New York City, for defendant.

## OPINION AND ORDER

GERSHON, District Judge.

The background of this case is set forth in detail in this court's previous order dated March 28, 2002, *see Husain v. Springer*, 193 F.Supp.2d 664 (E.D.N.Y.2002), and in the Report and Recommendation of Magistrate Judge Cheryl L. Pollak dated May 1, 2001 ("R & R"). The heart of this case is the plaintiffs' claim that their First Amendment right to free speech was violated by the decision of the president of the College of Staten Island ("CSI"), a senior college operated by the City University of New York ("CUNY"), to nullify and reschedule a student government election in the Spring term of 1997 based on a finding that a special election issue of the *College Voice*, a student newspaper, endorsing one slate of candidates over another, had improperly influenced the election. Plaintiffs were CSI students in Spring 1997: several were editors or staff on the *College Voice*; several were candidates running for office on the Student Union slate; and one was a student who voted in the Spring 1997 election, but was not associated with either the Student Union or the *College Voice*.

On March 28, 2002, this court dismissed the claims against all the defendants except CSI President Marlene Springer, CSI Vice–President for Student Affairs Carol Jackson, and Michael Silva and Marla Brinson,[1] two former CSI administrative employees, on grounds of Eleventh Amendment immunity. The court denied

---

1. The parties later stipulated to dismiss the claims against Marla Brinson.

plaintiffs' motion for summary judgment as to President Springer on the First Amendment claim, finding that further discovery was necessary to determine "whether President Springer's decision was a constitutionally permissible content-based determination designed to confine speech in the student newspaper within the scope of a limited public forum or whether it was a decision based on impermissible viewpoint based discrimination." Discovery is now complete, and plaintiffs once again move for summary judgment against defendant Springer on the First Amendment claim. At this time the only relief sought is compensatory damages and punitive damages of one dollar against defendants Springer, Jackson and Silva in their individual capacities. Defendants also move for summary judgment on the grounds that there was no First Amendment violation and that they are all entitled to qualified immunity.

### Background Facts

The material facts are not disputed. In 1997, the *College Voice* was one of three student newspapers funded primarily by CSI student activity fees. The *College Voice* published articles and editorials on a wide range of topics, including articles on CSI, CUNY, local, national and international affairs, reviews and poetry. The editors of the *College Voice* chose the material that the newspaper published without any supervision or prior review by anyone other than the editors and staff of the newspaper. The *College Voice* was not prohibited from publishing articles and editorials expressing opinions or endorsing candidates in student elections and, in fact, did endorse candidates in Student Government elections. There was no rule or regulation prohibiting or restricting the editors or staff members of the *College Voice* from running for student government positions or from endorsing themselves.

During the Fall 1996 term a number of CSI students concerned about various issues pertaining to student life at CSI and CUNY began meeting and named themselves the "Student Union." The Student Union presented a list of demands to the college administration, including demands for 24 hour access to the school library and computer center and increased childcare facilities. Several members of the *College Voice* were active in the Student Union. The February 1997 issue of the College Voice published a number of articles and editorials supporting the demands of the Student Union and urging students to join the new organization. It also published articles critical of the incumbent student government and its officers.

The CUNY bylaws require each CUNY college to establish a Student Election Review Committee ("SERC") to approve election procedures and certify results in student elections at CSI. The President of CSI appoints the four-member SERC, which may include students, faculty or administrators at CSI. Any party adversely affected by a decision of the SERC may appeal to the College President who has the final authority regarding certification of student election results and adjudication of complaints and violations of election rules. In Spring 1997, Michael Silva, CSI Assistant Director of Student Life, served as chair of the SERC.

On May 1, 1997, the SERC decided to postpone the student government election, after receiving a complaint from a student candidate from an opposing party that the *College Voice* published a special election issue that contained two pages of platform statements by candidates running on the Student Union slate and an endorsement on the front page encouraging readers to "Vote Student Union!"

Following the SERC's decision, the polls were closed while plaintiffs and other Stu-

dent Union candidates appealed the decision to CSI President Marlene Springer, who reopened the polls later that day, but reserved the final decision on the validity of the election until after the completion of voting. The special election issue was distributed throughout the election period. No candidates were disqualified from the election, and no disciplinary action was taken against any student editor or candidate. On May 6, 1997, President Springer affirmed the SERC's decision nullifying the election and scheduled a new election. She explained her decision as follows:

> The *College Voice* inappropriately used student activity fee funds to publish and distribute approximately five thousand copies of a twenty-eight page issue of the *College Voice* with a cover boldly encouraging a vote for a particular slate of candidates, some of whom are also staff members of the *College Voice*. Moreover, much of the issue was substantially devoted to supporting the endorsed slate of candidates. I find that this issue amounted to a thinly veiled student activity fee funded piece of campaign literature for the Student Union slate. As a result, the electoral process was compromised beyond its ability to be fair to all candidates, as argued by other candidates who requested nullification of the election.
>
> The April 30th to May 3rd election is therefore declared null and void, and a new election shall be scheduled for the period Thursday May 8th, 1997 through Friday, May 16, 1997.

The Student Union candidates won all 37 races in both the canceled election and the rescheduled election.

CSI had adopted Election Rules which candidates must follow in order to be placed on the ballot for a student government election. President Springer stated in her deposition that she relied on two of these Election Rules in effect during the May 1997 elections in making her decision:

> Rule 2. The campus newspapers may not be used as posters on walls, bulletin boards, etc., and may not be used as a means to distribute campaign flyers.
>
> Rule 5. The Student Government will be glad to make you 30 copies of your stamped and approved poster or flyer. All candidates must remove their election materials from the designated areas after the election is over.

These Rules are printed, along with other regulations for candidates, on a form that candidates must sign prior to being placed on the ballot in a student election.

President Springer explained her reliance on these Rules as follows: In her opinion, Rule 2 meant that printing an opinion in a college newspaper favoring one candidate, or slate of candidates, over another would result in an inappropriate use of student activity fees if the "entire issue" was dedicated to only one slate of candidates or if it contained a "blatant" appeal to vote for one slate over the other, even in an editorial. In her opinion, no violation of the Rules would occur if the coverage was "evenhanded." She based her decision to nullify the election on the fact that student candidates sign an agreement stating that they will receive 30 flyers from the student government free of charge and that the newspapers are not to be used as "campaign literature." Springer Deposition ("Sp.Dep.") at pages 19–29.

President Springer stated that the timing of the issue of the *College Voice* had a bearing on her determination that the material published inside it amounted to campaign literature. *Id.* at 34. She explained that, because it came out during the election, it had the purpose of furthering the Student Union campaign. According to President Springer, if the "Student Union 12–point program for change" had come

out several months before the election, whether it was an inappropriate use of student activity fees would depend upon the "context" in which it was published and whether or not the opposing candidates had an opportunity to respond to it. In her opinion, the *College Voice* was not obligated to present both sides of all issues; only student election coverage had to be "balanced" and "honestly present both sides." The *College Voice* could endorse a candidate or party, but should do so in a small editorial rather than as a part of the "whole issue." *Id.* at 37.

President Springer was shown a later issue of the *College Voice*, from May 1998, that contained a back page announcing, "Progressive Student Alliance, Plan of Action;" a full page editorial on page eight which said "The College Voice Endorsement, Vote for the Progressive Student Alliance;" and platform statements on page nine. When asked whether this issue represented a proper use of student activity fees, President Springer said, "I don't know the context of this edition of the College Voice. I don't know when it came out vis-a-vis the elections at hand. I don't know if there were any protests against this, so I have no way of knowing." *Id.* at 43. When asked if this issue was the same sort of campaign literature as the May 1997 issue, or if it presented a more balanced view of the student government election, President Springer said, "Since I have no sense of what the balance would be, since I don't know who was running against these people or what position they were in, it would be extremely difficult to say. As far as I know, I received no complaints from either side on this particular issue." *Id.* at 44. President Springer said that she could not determine whether an edition of the *College Voice* was an inappropriate use of student activity fees unless she could "review the entire document and put it in the context of the election." "I would have to review the

contents and the context and have a sense of that." *Id.* at 45.

### First Amendment Claim

I turn to the merits of the First Amendment claim before addressing qualified immunity. *See Clue v. Johnson*, 179 F.3d 57, 60 (2d Cir.1999); *Cf. Mollica v. Volker*, 229 F.3d 366 (2d Cir.2000).

 Although discrimination against speech because of its message is presumed to be unconstitutional, *see Turner Broadcasting System, Inc. v. Federal Communications Commission, et al.*, 512 U.S. 622, 641–43, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), where the State creates a limited public forum, it may reserve it for certain groups or for the discussion of certain topics. *Rosenberger v. Rector and Visitors of the University of Virginia*, 515 U.S. 819, at 829, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). "Once it has opened a limited forum, however, the State must respect the lawful boundaries it has itself set." *Id.* In the context of a limited public forum, then, the State may engage in content discrimination in order to preserve the purposes of the limited public forum and, in doing so, may not only exclude certain groups from participating in the forum, but may also exclude the discussion of certain topics. *Id.* at 829–30, 115 S.Ct. 2510. The States's power to restrict speech, however, must not be used to discriminate against speech on the basis of viewpoint and must be reasonable in light of the purpose served by the forum. *Good News Club v. Milford Central School*, 533 U.S. 98, 106–107, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001).

It is undisputed that the *College Voice* is a limited public forum open to a limited class of speakers consisting of CSI students, and that there are no subject matter restrictions on what the newspaper may publish. In accordance with college

and university policy granting editorial autonomy to student publications at CUNY colleges, the student editors determine what articles or advertisements are printed in the College Voice. *See Leeds v. Meltz*, 85 F.3d 51, 54–55 (2d Cir.1996) (noting that "CUNY did not, and recognized that it could not, control the editorial decisions of student editors" and citing a legal memorandum to the CUNY Council of Presidents, dated January 11, 1995, which "expressly disclaim[ed] any right of the institution to control student publications, such as those financed through student activity fees"). Thus, the restrictions imposed on the limited public forum here are only that the forum is limited to a certain class of speakers, namely CSI students.

There is also no dispute that the Election Rules do not prohibit student newspapers from publishing editorials concerning elections, nor are they prohibited from printing campaign literature. Nevertheless, although defendants state that there is no dispute as to any material fact, they argue that the Rules *implicitly* define the scope of the content of the campus newspapers. As no reasonable jury could conclude that the Rules are directed at the editorial content of the campus newspapers, that argument is rejected.

The only Rules that President Springer relied on and that defendants say are relevant, Election Rules 2 and 5, define the responsibility of the individual student candidates, not the scope of the content of the college newspapers. Rule 2 simply prohibits inserting flyers into the campus papers as a means of distribution and using the newspapers as a posters. Rule 5 simply states the number of pre-approved fliers that the student government will print free of charge for each student candidate. The Rules do not, explicitly or even implicitly, preclude campus newspapers from endorsing candidates or running platform statements. There is nothing in the rules concerning "balanced" coverage, the "context" of editorials, or the placement of headlines or platform statements. Indeed, implicit in Rule 2's requirement that candidates should not use the newspapers as posters is the acknowledgment that the papers may contain favorable opinions and support for a candidate that he or she would *want* to post on a bulletin board. That Rule 5 provides that the student government will print and pay for 30 posters or flyers imposes no restriction on the number of issues of the school newspaper which may contain an endorsement. There are simply no written guidelines to establish that what was printed in the May 1997 issue of the *College Voice* was prohibited.

■ Thus, I find there is no support for the argument that the Election Rules in effect for the 1997 election established the scope of the limited public forum of the *College Voice*, or any other newspaper, or that there were any neutral content-based restrictions established by those Rules. The Election Rules, or even the "spirit" of the Rules that President Springer relied on, do not establish the boundaries and scope of the limited public forum. Nor is there any evidence that President Springer relied on any tradition or established practice as to the campus newspapers' election coverage when she made her decision to nullify the election. *Cf. Hotel Employees & Restaurant Employees Union v. City of New York Department of Parks & Recreation*, 311 F.3d 534, 541 (2d Cir.2002) (relying on the unwritten practice of limiting access to events "having a performance, entertainment or other artistic component" to deny access to a limited public forum for a protest). On the contrary, President Springer acknowledged that it was perfectly appropriate for the college newspapers to take a position with respect to an upcoming election. In light of that,

there is no basis other than an improper content-based restriction to say that what the *College Voice* printed was "too much."

The Court in *Rosenberger* explained:

In determining whether the state is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, we have observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited public forum, and, on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

515 U.S. at 829–30, 115 S.Ct. 2510. The Court further recognized that "the distinction is not a precise one" because to discriminate based on the viewpoint of a speaker is of necessity a "subset ... of content discrimination." *Id.* at 831, 115 S.Ct. 2510. President Springer did not exclude political statements or platforms as a subject matter, but sought reprisal when a particular viewpoint was being promoted. Thus, it was the viewpoint of the articles that was discriminated against. The viewpoint espoused in the contested issue of the *College Voice* presented a certain perspective on the way the University should be run, and the way that certain students would attempt to guide the University if elected in the upcoming election. It was the aggressive promotion of one perspective over another that was punished, not the printing of political subject matter. According to President Springer, the content of the newspaper would not have violated any Rules had there been no complaints, or had the issue carried as much coverage on the other slate. She relies solely on the amount of the coverage and the one-sided views espoused as the basis for reprisal. But, having opened the forum without restriction, the College President could not constitutionally restrict the newspaper from printing its views, or force it to print views it did not wish to print.

In sum, in the absence of a finding that the College was merely protecting the scope of the limited public forum, President Springer's decision must be viewed as a viewpoint-based restriction. The issue then is whether President Springer's restrictions were "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." *Perry Educ. Assn. v. Perry Local Educators' Assoc.,* 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The defendants, who have hinged their defense of this action on the claim that President Springer was merely preserving the scope of the limited public forum, make no effort to show that her actions were supported by a compelling state interest, or that there were less intrusive alternatives to her decision to nullify the election results. Obviously, assuring the fairness of a student election is an important interest, but there is no evidence to show that her actions were "necessary" to serve that interest or "narrowly drawn to achieve that end."

Defendants argue that plaintiffs suffered no injury and that they are merely asserting a chill which is insufficient to sustain the First Amendment claim. As Magistrate Judge Pollak correctly noted in her Report and Recommendation, although the refusal by a University to provide funding for a school publication based upon the viewpoint of its articles is clearly a form of retaliation under *Rosenberger,* "nothing in that case suggests that other means of discriminating or retaliating against a student newspaper based on the viewpoints expressed therein are not equally actionable." R & R at 19–20. Judge Pollak went on to say that "while the CUNY defendants' decision to nullify the initial

result of the 1997 student government election based upon the content of the *College Voice* election edition did not prevent the dissemination of the views expressed by the editors, the CUNY defendants' actions, in calling for a new election and new voting" alleged an act of retaliation, "placing the election of the Student Union candidates in jeopardy." R & R at 21. Judge Pollak rejected the defendants' effort to dismiss the First Amendment claims on the theory that the cancellation of the election, in the absence of a denial of funding or impoundment of the paper, did not violate the plaintiffs' First Amendment rights. This court agreed with Judge Pollack and refused to dismiss the First Amendment claims. I continue to believe that Judge Pollak was correct. It cannot be that University action taken as a direct result of the views printed in a student newspaper can escape First Amendment scrutiny simply because that action was directed toward the nullification of the goal that the students espoused rather than at the vehicle, the newspaper, in which that goal was promoted. The chill on expressive freedom is the same. As the Supreme Court noted in *Rosenberger:*

> The first danger to liberty lies in granting the State the power to examine publications to determine whether or not they are based on some ultimate idea and, if so, to classify them. The second, and corollary danger is to speech from the chilling of individual thought and expression. That danger is especially real in the University setting, where the State acts against a background and tradition of thought and experiment that is at the center of our intellectual and philosophic tradition ... The quality and creative power of student intellectual life to this day remains a vital measure of a school's influence and attainment. For the University, by regulation, to cast

disapproval on particular viewpoints of its students risks the suppression of free speech and creative inquiry in one of the vital centers for the Nation's intellectual life, its college and university campuses. 515 U.S. at 835–36, 115 S.Ct. 2510 (citations omitted).

■ This is not a case where there is merely a hypothetical threat of reprisal for the publication of substantial election coverage in a college paper, nor a case where no reprisal had yet been felt as a result of expressive activity. Here, there was concrete action taken in nullifying a student election because of a publication supportive of a particular slate of candidates which won the election. The threat or chill that plaintiffs assert that they felt regarding future issues of the newspaper is not merely subjective, but has already been experienced.[2] It is clear that "constitutional violations may arise from the deterrent or 'chilling' effect of governmental regulations that fall short of a direct prohibition against the exercise of First Amendment rights." *See Laird v. Tatum,* 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *accord, Hankard v. Town of Avon,* 126 F.3d 418, 423 (2d Cir.1997). That is what occurred here.

In sum, I find that President Springer's actions resulted in a denial of plaintiffs' First Amendment right to be free from reprisals based upon the content of the articles that were published in the *College Voice.*

### *Jackson and Silva*

■ Defendants claim that Carol Jackson, Vice–President for Student Affairs, and Michael Silva, CSI Assistant Director of Student Life, were not responsible for President Springer's decision and cannot be held liable for any resulting violation

---

**2.** *See* R & R at 20, fn. 12.

that stemmed from it. The students complained to the SERC, and that committee voted to postpone the elections until a later time. President Springer's decision was the result of an appeal of that decision. Although Jackson and Silva may have advised her on how to proceed, her decision was an intervening step between any actions on their part and the resulting harm to plaintiffs. *See e.g. Taylor v. Brentwood Union Free School District,* 143 F.3d 679, 686–88 (2d Cir.1998); *Jeffries v. Harleston,* 52 F.3d 9, 14–15 (2d Cir.1995). Thus, I agree that Jackson and Silva cannot be held liable under Section 1983.

### Qualified Immunity

Having determined that President Springer's actions violated plaintiffs' First Amendment rights, I must now address whether she has qualified immunity. All defendants argue that, even if their actions violated the constitution, under *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), they are entitled to qualified immunity because their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

■ "The defense of qualified immunity shields government officials from liability if the official's conduct did not violate constitutional rights that were clearly established at the pertinent time or if it was objectively reasonable for the official to believe that the conduct did not violate such rights." *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999). There are three factors to consider when determining whether qualified immunity applies: (1) whether the right in question was defined with reasonable specificity; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have under-

stood that his or her acts were unlawful. *Id.; See also Mollica,* 229 F.3d 366 at 371 (2d Cir.2000).

■ While I find that it was clearly established in 1997 that, in the absence of reasonable limitations on the scope of the limited public forum, college newspapers had the right to print election-related coverage without retribution, it was not yet clearly established that nullifying and rescheduling the student government election that was the subject of that coverage was an impermissible retribution for that expression. That is, it was not established with sufficient specificity that cancelling a student government election, as opposed to impounding the newspaper, denying funding, or directly disciplining students, would constitute an actionable form of reprisal against them. While I so hold today, no case had so held at the time President Springer acted.

> For a constitutional right to be 'clearly established' for purposes of determining whether an officer is entitled to qualified immunity, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that *in light of pre-existing law the unlawfulness must be apparent.*

*Mollica,* 229 F.3d at 370–71 (emphasis added in *Mollica*) (*quoting Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). In this case I cannot conclude that a reasonable official in President Springer's position would have understood that her acts were unlawful. Thus, the defendants are protected by qualified immunity.

### Conclusion

For the reasons stated above, defendants' motion for summary judgment on the basis of qualified immunity is granted. The Clerk of Court is directed to enter summary judgment for all defendants.

**SO ORDERED.**